**In the Matter of George L. SHILLAIRE III, Respondent.**

No. 86–848.

District of Columbia Court of Appeals.

Submitted July 14, 1988.

Decided Oct. 25, 1988.

Michael S. Frisch, Asst. Bar Counsel, Washington, D.C., entered an appearance for petitioner, Office of Bar Counsel.

Robert S. Litt, Washington, D.C., entered an appearance for respondent.*

Before TERRY, ROGERS and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

## I

The Bar is a noble calling. One who becomes a member of the legal profession is not embarking on a career in trade. Rather, he or she is enlisting as a participant in the administration of justice. As stated in the Preamble to the Code of Professional Responsibility,

> the continued existence of a free and democratic society depends upon recognition of the concept that justice is based upon the rule of law ...
> Lawyers, as guardians of the law, play a vital role in the preservation of society ... A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

Membership in our honorable profession is a privilege which places special burdens upon those choosing to pursue it. *In re Rouss*, 221 N.Y. 81, 84, 116 N.E. 782, 783 (1917); *State v. Fishkind*, 107 So.2d 131 (Fla.1958). Because our "fortunes, reputa-

tions, domestic peace ... nay, our liberty and life itself rest in the hands of legal advocates, their character must be not only without stain, but without suspicion." G. SHARSWOOD, AN ESSAY ON PROFESSIONAL ETHICS 172 (3rd ed. 1869), quoted in D. Rhode, *Moral Character as a Professional Credential*, 94 YALE L.J. 491, 507–08 (1985) (hereinafter *Moral Character*). In the words of Justice Frankfurter, concurring in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957), lawyers stand

> as a shield ... in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

We are all human, and a lawyer cannot be required to be a plaster saint, but he or she should surely be expected, at the very least, to behave in a way that demonstrates "honesty, fairness and respect for the rights of others and for the laws of the state and nation." *See Konigsberg v. State Bar of California*, 353 U.S. 252, 263, 77 S.Ct. 722, 728, 1 L.Ed.2d 810 (1957).

These principles have particular cogency in cases involving bar discipline. One of the responsibilities of this court, as the highest tribunal in this jurisdiction, is to determine whether an attorney charged with misconduct may or may not continue to practice law in the District of Columbia. It is our duty to maintain the integrity of the legal profession by disciplining lawyers who indulge in practices which bring the court or the profession into disrepute, or which corrupt or defeat the administration of justice. *State v. Rhodes*, 177 Neb. 650, 651, 131 N.W.2d 118, 121 (1964). This obligation takes on special importance at a time when lawyers occupying exalted positions in our land, including in the compara-

---

\* No briefs were filed in this court. Named counsel appeared before the Board on Professional Responsibility.

tively recent past two Attorneys General, have disgraced their offices and their profession by criminal or unlawful conduct. *See* Papke, *The Watergate Lawyers All Passed the Character and Fitness Committee*, 2 Colum.U.F. 15 (1973), cited in *Moral Character, supra,* 94 YALE L.J. at 510 n. 86. We agree with the Supreme Court of Florida that

> As members of this profession we realize that our standing is often measured in the layman's mind by the manner in which we discipline that small minority of our brethren who break the rules of fidelity and trust required by our calling.

*Fishkind, supra,* 107 So.2d at 132–133.

In carrying out our responsibility to discipline errant attorneys, we do well as judges to heed the biblical admonition to let him who is without sin cast the first stone. It behooves us to recognize our fallibility as we try to follow the law and, where judgment and discretion are called for, to exercise them soundly and with restraint. Lawyers are people too, and courts should address disciplinary problems humanely and with a due sense of proportion rather than in a spirit of vengeance. Before we impose a sanction, we must be sure that there is reliable evidence to support it.

But the community has rights too. It is our duty, in dealing with problems of bar discipline, to strive to bring about that day, which surely seems distant in the autumn of 1988, when membership in the Bar will be recognized by the citizens of our fair capital as a badge of honor, carrying with it assurance of the highest character and integrity. Perhaps our reach may exceed our grasp, but we surely falter in our responsibilities if we do not do our utmost to enable our profession both to merit and to secure the highest possible measure of public confidence and esteem. Just as we must respect the accused lawyer's right not to be hounded from his profession on the basis of rumor or unfounded accusation, so too we must ensure that the public is not short-changed by an unduly restrictive approach to the kinds of evidence which may be considered. This surely means, at least, that where powerful probative evidence

against an attorney is admissible under the rules which govern disciplinary proceedings, it cannot simply be disregarded.

In the present case, we must address the case of an attorney who was convicted of threatening a prospective prosecution witness in a federal criminal proceeding against him in the State of Michigan and suspended from practice for one year in that state. Although the statutory law of this jurisdiction requires the disbarment of an attorney who has been convicted of a crime involving moral turpitude, D.C.Code § 11–2503(a) (1981), the Board on Professional Responsibility (the Board) found that moral turpitude had not been shown and recommended reciprocal discipline. In making that recommendation, the Board declined to consider an affidavit by a Special Agent of the Federal Bureau of Investigation (F.B.I.), which was never contested by the attorney, and which detailed the circumstances surrounding the attorney's conviction and cast his conduct in a far more damaging light. Because we find the Board's failure to consider the affidavit to constitute legal error, and because the record as a whole, with the affidavit accorded appropriate weight, points towards moral turpitude and disbarment, we remand to the Board for further proceedings.

## II

On March 13, 1986, George L. Shillaire, Esq. entered a plea of guilty in the United States District Court for the Eastern District of Michigan to misdemeanor violations of 18 U.S.C. § 701 (unlawful possession of Federal insignia) and 18 U.S.C. § 1512(b) (harassment of a Federal witness). More serious felony charges against him were dismissed as part of a plea agreement. The insignia charge arose from Shillaire's having mailed a letter on June 12, 1984, on United States Senate stationery, imprinted with Senator Howard W. Cannon's signature, in an attempt to collect a private debt from a former client, one Daniel Adler. The harassment charge arose from an encounter with Adler at the United States Courthouse on October 9, 1984 in which Shillaire threatened Adler and made an obscene gesture to him in connection with

Adler's cooperation with the government in criminal proceedings then pending against Shillaire.[1]

During the plea proceedings, the government adopted as its proffer of evidence an affidavit by Special Agent Justin G. Fox of the F.B.I. According to Special Agent Fox, Adler had sought Shillaire's assistance in forestalling Adler's possible deportation from the United States. Adler subsequently reported to the F.B.I. that Shillaire had told him that he (Shillaire) had connections in the United States Senate, and that through these connections he could prevent Adler's threatened deportation in return for payments of cash. On receipt of this information, the F.B.I. instituted a comprehensive investigation, which, according to the affidavit, eventually included a wiretap on Shillaire's telephone and the tape recording by F.B.I. informants of conversations which they had with Shillaire. According to Special Agent Fox, the investigation corroborated Adler's allegations, and Shillaire was eventually indicted for alleged bribery of public officials.[2] The Fox affidavit then outlines a series of events which arose out of the investigation of the alleged bribery and which resulted in Shillaire's plea to and conviction of other charges, as described above.

Some of the allegations in the Fox affidavit were framed in terms of rumors reported by Adler, and others described incidents which were not shown to have been connected with Shillaire. A substantial portion of the material in the Fox affidavit, however, is based on information provided to the F.B.I. by informants who, according to the affidavit, had direct dealings with Shillaire. In several instances, the informants' accounts are said to be supported by tape recordings. The basic thrust of the affidavit is that after Shillaire learned that

Adler had made accusations against him that had led to the F.B.I. investigation, he and his common law wife began to make comments about Adler indicating that they intended him harm and even death, and took at least exploratory steps towards matching their words with deeds. Some parts of the affidavit are quite specific and colorful in describing the means by which Adler was to be threatened or harmed. If true, these allegations paint a very negative picture indeed of Shillaire's conduct and substantially affect the character of the record on which the selection of an appropriate sanction must be made.

### III

During the plea proceedings and thereafter, Shillaire readily admitted committing the insignia offense. He indicated that when a check which Adler had forwarded to him for legal services was returned for lack of sufficient funds, he wrote Adler a note seeking payment and mailed it in an envelope that had been given to him by a former aide to Senator Cannon. Shillaire placed a stamp on the envelope. He denied any intent to deceive Adler or to pretend that he had any connection with the government (claiming that Adler knew the contrary to be the case), but acknowledged that he knew that his conduct was illegal.

With respect to the harassment offense, Shillaire's version emerged in the following colloquy with the judge who accepted the plea:

> THE COURT: With regard to Count 2, could you tell me what you did?
> DEFENDANT SHILLAIRE: Yes, Your Honor. Mr. Adler was in the hallway upstairs on the pay phone, and when he was walking up the steps of the courthouse, he made a mocking face at me and a gesture, and I returned a—I took

---

1. The government alleged that Shillaire, in addition to giving Adler "the finger," told him that he would be "squashed like a bug." Shillaire's version was that his gesture was accompanied by an obscenity, and that he told Adler "you'll get yours," or words to that effect.

2. *See* 18 U.S.C. §§ 201(b)(2), 203(b). There appears to be some confusion as to whether Shillaire was in fact indicted for bribery, for the

judge at sentencing commented that the "grand jury refused to indict." The plea agreement, however, refers to the dismissal of the indictment and the return of a superseding indictment. In any event, our views on the issues now before the court are not contingent on whether or not an indictment for bribery was returned.

my middle finger and gave him the finger and made a statement to the effect that, you know, that he would get his one day, and....

THE COURT: Is that the sum and substance of what you said or did?

DEFENDANT SHILLAIRE: I was under indictment at that time and he was a witness. He was a Federal witness, Your Honor, and I made a menacing gesture toward him and made some statements that I certainly shouldn't have made, and I'm sorry that I did.

THE COURT: What kind of statement did you make?

DEFENDANT SHILLAIRE: I made a statement that he would get his. I think I used some abusive language.

THE COURT: Did you make any other remarks that logically and reasonably could have been construed as threatening?

DEFENDANT SHILLAIRE: Yes, Your Honor. It was—it was—I was very upset. I was very angry. I was very mad, and that one human being could do this to another human being—and I think I reasonably calculated the gesture and the—the gesture and my facial expressions and the comments that I made, I would say certainly would cause a harassment of a Federal witness, and I also made—on other occasions, I made—in the heat of tremendous anger and being upset, I made numerous other statements to numerous other third parties that I would like to get the gentleman that did this to me and my family.

THE COURT: I'm sorry. I didn't hear the last.

DEFENDANT SHILLAIRE: That I would like to get even with the person that did this to myself and my family, the guy that set me up, the FBI informant.

THE COURT: Would all of those comments have suggested to a third party that you intended to inflict bodily harm upon Daniel Stephen Adler?

DEFENDANT SHILLAIRE: I think they could have been construed that way, yes, Your Honor.

THE COURT: Did you know that to threaten a Government witness was against the law?

DEFENDANT SHILLAIRE: Yes, Your Honor, I did. I was advised of that....

THE COURT: I'm sorry?

DEFENDANT SHILLAIRE: I was advised of that by the agent.

THE COURT: Were you aware of it at the time?

DEFENDANT SHILLAIRE: Yes, Your Honor.

Shillaire was never questioned about the specifics of the Fox affidavit. His counsel, by his own account, had not looked at it. When asked if he would like to read it, counsel responded "not particularly. I think I know what it says." Shillaire's obvious incentive to contest the allegations in the Fox affidavit if they were untrue, and the significance of his failure to do so, are discussed in some detail at pp. 343–344, *infra*. The Assistant United States Attorney made it clear, in any event, that the witnesses and evidence were available in court if the judge wished to hear substantiation of the government's charges.

## IV

After his plea of guilty and an evaluation of his mental health pursuant to 18 U.S.C. § 4205(c), Shillaire was placed on probation and ordered to pay restitution. Disciplinary proceedings were instituted against him in Michigan and resulted in the issuance, by consent, of an order of suspension from practice for one year. Under the terms of that order, Shillaire is required to reapply for admission before being permitted to practice again.

Following these events, Shillaire was suspended from practice in the District of Columbia by this court, and the matter was referred to the Board on Professional Responsibility for proceedings to determine whether his crimes involved moral turpitude. The Board, acting in conformity with the procedure described in *In re Colson*, 412 A.2d 1160 (D.C.1979) (*en banc*), determined that the offenses of which Shillaire was convicted did not involve moral turpitude *per se*. The Board therefore referred

the matter to a Hearing Committee for a hearing and for a recommendation as to whether the underlying facts of the offenses showed moral turpitude and therefore mandated disbarment.

The Hearing Committee recognized the seriousness of the charges against Shillaire and attempted diligently to secure all of the available evidence related to his offenses so that it could evaluate the issue of moral turpitude comprehensively and fairly. At a pre-hearing conference on March 9, 1987, however, Bar Counsel[3] advised the Committee that his investigation had not revealed moral turpitude. He stated that counsel would attempt to present the Committee with a stipulation of facts, and that no hearing would be necessary.

Although the Committee thereafter advised the parties, repeatedly and in no uncertain terms, of its interest in the underlying evidence, Bar Counsel took a somewhat parsimonious approach to the issue of relevance. After the Committee inquired if he proposed to call live witnesses, he stated that he did not believe any witnesses were available, and that none would be called in any event. In response to an inquiry from the Committee as to documentary evidence, Bar Counsel initially presented only a rather bland stipulation of the parties describing the criminal proceedings, together with three pages of the transcript of the three-day disciplinary proceedings in Michigan. Bar Counsel did not initially submit the Fox affidavit, stating that, in his view, it "injected irrelevant material into the deliberations here." After the Committee advised the parties of its view that "the current record does not provide an adequate basis on which to make a finding on the moral turpitude issue," Bar Counsel reluctantly[4] provided documents relating to the arrest warrant, including the Fox affidavit. Although Bar Counsel was in possession of transcribed conversations which preceded the preparation of the arrest warrant, he declined to make them available, on the grounds that their prejudicial impact outweighed their probative value. Shillaire presented a "declaration" in which he essentially adhered to his version of the events as related in the plea proceedings, and was excused from appearing personally.

The Hearing Committee thus received the case in a stipulated posture. Both parties recommended a finding of no moral turpitude and the imposition of reciprocal discipline. The Committee nevertheless concluded, in a thoughtful and comprehensive opinion, that the harassment offense involved moral turpitude. The Committee declined to consider the Fox affidavit, taking the view that the record did not reflect "a genuine, conscious awareness by Shillaire that by pleading guilty ... he was signing on to the particular allegations made in the Fox affidavit." Nevertheless, the Committee found that threatening behavior towards a witness relates directly to the administration of justice. It viewed such conduct, in general, as involving moral turpitude, especially when the person making the threats is a lawyer. The Committee thought that any moral turpitude which might otherwise have characterized the courthouse incident, standing alone, was vitiated by the circumstances, for in its view the incident had resulted from a chance encounter, Adler had "baited" Shillaire, and Shillaire had acted in the heat of anger. The Committee concluded, however, that when the threat to Adler in the courthouse was viewed in conjunction with the numerous threatening remarks about Adler which Shillaire admitted making to third parties over a substantial period of time, then Shillaire's anger "did not suffice to vitiate the moral turpitude element of his behavior."

The Committee noted that the sentencing judge had treated Shillaire leniently and that the Michigan authorities had not disbarred him. The Committee concluded, however, that in the absence of any explanation in the record before it of factors

3. Throughout this proceeding, two successive Bar Counsel were represented by the same Assistant Bar Counsel.

4. Bar Counsel stated that he would make the affidavit available "if the Committee feels it needs it."

which would vitiate a finding of moral turpitude, it could not accept on faith that such factors existed:

> [The Committee] cannot simply say to the community we think the conduct, which may appear to be morally reprehensible, in fact was not reprehensible because other lawyers in other jurisdictions must have thought so. Rather the articulable factors must explain to the community *why* a moral turpitude judgment is correct, whether that judgment be ours or that of other authorities.

On March 4, 1988, the Board of Professional Responsibility issued the Report and Recommendation presently before us. Briefly, the Board sustained all of the Hearing Committee's rulings favorable to Shillaire, including the Committee's decision not to consider the Fox affidavit. The Board did not agree with the Committee, however, that the harassment offense involved moral turpitude. The Board noted that the Hearing Committee had found the record before it sparse with respect to Shillaire's communications to third persons, and that the parties had subsequently declined to supplement it. The Board concluded that this limited record

> does not support a finding, by clear and convincing evidence, that Respondent possessed either the intent to prevent Mr. Adler from testifying or the intent that his remarks to third parties be communicated to Mr. Adler.

Although the Board viewed Shillaire's conduct as "reprehensible," it found that moral turpitude had not been established and recommended the imposition of reciprocal discipline and a sanction of suspension for one year, with the requirement that Shillaire not be readmitted to practice without first demonstrating his fitness.

### V

■ Our Disciplinary Rule XI § 7(3) provides in pertinent part that

> in considering the appropriate order, the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record....

On its face, this Rule gives the Board authority comparable to that of an administrative agency, but there is an important difference, for

> unlike agency action which is binding upon the parties unless a petition for judicial review is filed, disbarment, suspension, or censure of an attorney can be made effective only upon an order of this court.

*In re Dwyer*, 399 A.2d 1, 11 (D.C.1979). *See* D.C.Code §§ 11–2502, 2503(b) (1981). In the final analysis, the responsibility to discipline lawyers is the court's. The buck stops here.

Our consideration of the Board's findings and recommendations represents the second level of review in this case. The evidence regarding Shillaire was first considered by the Hearing Committee, rather than by the Board. Board Rule 13.6 provides in pertinent part that

> review by the Board shall be limited to the evidence presented to the Hearing Committee, except in extraordinary circumstances determined by the Board. When reviewing the findings of the Hearing Committee, the Board shall employ a "substantial evidence on the record as a whole" test.

To complicate the issue further, the Hearing Committee found that Shillaire's conduct involved moral turpitude. On the same record, without faulting any of the Committee's factual findings, the Board concluded that it did not. Obviously, the Board's view was based on a legal rather than a factual difference with the Hearing Committee.

In the present case, all three bodies—the Committee, the Board, and the court—are dealing entirely with a documentary record. Shillaire did not attend the hearings. Neither he nor Bar Counsel called witnesses. The prime evidence before the Committee and the Board, including the stipulation, the transcript of the plea proceedings, Shillaire's "declaration," and the Fox affidavit are all equally available for our examination. Neither the Hearing Committee nor the Board had occasion to observe the demeanor of witnesses or to assess their

credibility. This case thus presents the converse of the situation in *In re Gamblin,* 458 S.W.2d 321, 323 (Mo.1970) where the court said:

> [W]hile we can match one statement with another, witness by witness, from the record before us, on credibility we are not in as good a position as the trier of fact was to judge who is and who was not telling the whole truth.

*Accord, In re Lurie,* 113 Ariz. 95, 96, 546 P.2d 1126, 1127 (1976); *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 479, 345 A.2d 616, 620 (1975), *cert. denied,* 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976).

In any event, we think that the ultimate issue of moral turpitude is one of law rather than of fact.[5] Although the underlying issue of Shillaire's intent is of course one of fact, the Board's conclusions with respect to that question are undermined by its decision (and that of the Hearing Committee) not to consider the Fox affidavit and from Shillaire's unexplained silence after being given several opportunities to contest it.

The Board's decision not to give any weight to the Fox affidavit was, in our judgment, an error of law. By excluding from its considerations probative evidence and reasonable inferences that could and should have been drawn from that evidence, the Board made its assessment of Shillaire's conduct in an artificially constricted vacuum, in which the harassment offense appeared to be an isolated incident of petulance rather than what, on its face, and without additional explanation, appears to be but one especially reprehensible part of a sordid mosaic of misconduct.

## VI

■ Rule 11.2 of the Board on Professional Responsibility provides that

> evidence that is relevant, not privileged, and not merely cumulative shall be received, and the Hearing Committee shall determine the weight and significance to be accorded all items of evidence upon which it relies. The Hearing Committee

shall not be bound by the provisions or rules of court practice, procedure, pleading or evidence, except as outlined in these rules or the Rules governing the Bar.

In light of this Rule, there can be no doubt that the Fox affidavit, although hearsay, was properly admissible in the proceedings against Shillaire. *Cf. Williams v. New York,* 337 U.S. 241, 246, 69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949) (wide discretion of judge with respect to kinds of materials that may be considered in criminal sentencing). The only legitimate issue as to the Fox affidavit relates to the weight that should be accorded to it. We perceive no basis in law or in reason for refusing to consider it or to give it any weight at all.

In the criminal case, the Fox affidavit constituted the government's proffer of what had occurred. This court has taken the approach in a prior disciplinary proceeding that

> a guilty plea represents both a conviction of a crime and an admission by the accused of the underlying facts.... Thus, in pleading guilty to distribution of child pornography, Wolff conceded that the government's proffer of the circumstances surrounding the offense was true. His admission is crucial as this court's inquiry focuses on whether the respondent's crime involved moral turpitude, given the particular facts present in this case.

*In re Wolff,* 490 A.2d 1118, 1119 (D.C. 1985), *adopted en banc* 511 A.2d 1047 (D.C. 1986).

■ In evaluating the view of the Hearing Committee and the Board that consideration of the affidavit would be unfair to Shillaire, it is important to recognize what this case is *not* about. In many instances, a criminal defendant, in pleading guilty to an offense, will admit the elements of that offense while steadfastly contesting the government's proffer of evidence. If that had occurred here—if Shillaire had simply admitted making the infelicitous remarks

5. Even if it is viewed as a mixed issue of law and fact, we conclude for the reasons set out

below that the Board's resolution of it was induced by error of law.

in the courthouse but had indignantly denied the other incriminating material in the Fox affidavit—then, absent other proof, Shillaire could reasonably contend that rigorous application of the principle enunciated in *Wolff* would be unfair to him. In the present case, however, the record reveals no such denial of the truth of the Fox affidavit. On the contrary, Shillaire's admissions to the court of the nature of his conversations with third parties tended, if anything, to corroborate the government's proffer. Moreover, with the prosecutor ready to adduce the evidence, some of it evidently on tape, it may reasonably be inferred that denial of some of the government's allegations would have been futile and might even have compounded Shillaire's problems.

It is true that, in this case, the judge did not question Shillaire as to each allegation in the Fox affidavit. Nevertheless, so far as the record discloses, Shillaire and his counsel knew that the affidavit could be considered by the judge at sentencing and by the Hearing Committee in determining whether there was moral turpitude. Absent some facts of which we have not been apprised, there could hardly have been a more compelling incentive to contest such devastating charges if they were false.[6] Common sense and even an elementary familiarity with human nature surely tell us, for example, that under normal circumstances, if a minor charge is true but a more damning one is fabricated, a person who has been wrongfully accused would protest with consummate indignation that the government was trying to malign him.

Shillaire acknowledged making numerous statements to numerous persons indicating that he would harm Adler. He defended himself by simply claiming in general terms that he was angry, and by denying that he was seeking to prevent Adler from testifying. Under these circumstances, we are entirely unpersuaded by the suggestion that those portions of the affidavit which are not rumor or multiple hearsay are so unreliable that they ought not to be considered at all. In fact, when one assesses and attempts to reconcile the allegations in the affidavit, Shillaire's apparent failure to contest them, and his own admissions about statements to third parties, the question of Shillaire's intent in committing the harassment offense, as well as the ultimate question of moral turpitude, are presented in an entirely different light.

The gist of the Board's position appears to be that the threat in the courthouse was, on this record, an isolated incident attributable to Shillaire's understandable anger against Adler, from which the intent to prevent Adler from testifying may not be inferred. We would be constrained to question that analysis even if the courthouse incident stood alone. Shillaire's rage did not originate in a vacuum. He was angry with Adler, by his own account, because Adler had reported him to the Department of Justice, which was prosecuting Shillaire. It was Adler's proposed testimony that underlay Shillaire's state of mind. In fact, Shillaire threatened to harm Adler in a federal courthouse, the very place where justice is to be done. Like anybody else, Shillaire must be held to intend the foreseeable consequences of his conduct. *Radio Officers v. Labor Board*, 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455 (1954). We do not believe that the Board adequately explained why the message to Adler was not the obvious one: if you testify against me, you will be squashed like a bug, or, (as Shillaire remembered the threat) "you'll get yours." The foreseeable and probable consequence of such a message is surely that it will intimidate and coerce the potential witness, and we are at a loss to understand how this common sense conclusion can be avoided in assessing Shillaire's intent.

In any event, as the Hearing Committee observed, the courthouse incident does not stand alone. It is accompanied in this record by numerous statements which Shil-

---

6. While the tape recordings are not a part of the record before us, Shillaire and his attorney presumably knew that Bar Counsel had them, and their failure to deny the allegations may well provide more reason to believe that they contain what Special Agent Fox has said that they contain.

laire acknowledged making to third parties to the effect that Adler would be harmed. The contemplated harm discussed in those statements would not have befallen Adler for reasons unrelated to his proposed testimony. It was threatened, obviously, as a result of Adler's having caused criminal proceedings to be brought against Shillaire and having "done this to me and my family." Shillaire's threatening behavior, as described in the Fox affidavit, took place over a period of many months, and this, if true, belies any suggestion that the courthouse incident was an aberration from otherwise legitimate conduct.

Whether or not the statements to third parties were communicated to Adler (which issue the Board apparently found to be critical), they "shed light" on the intent with which Shillaire threatened at the courthouse to do in his accuser, and thus "tend reasonably to show the purpose and character of the particular transactions under scrutiny." *Trade Comm'n v. Cement Institute*, 333 U.S. 683, 705, 68 S.Ct. 793, 805, 92 L.Ed. 1010 (1948). "Events obscure, ambiguous or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive and informative when considered in relation to other action." *Machinists Local v. Labor Board*, 362 U.S. 411, 416 n. 6, 80 S.Ct. 822, 826 n. 6, 4 L.Ed.2d 832 (1960). Under conventional evidentiary principles, the statements to third parties are surely relevant to Shillaire's motive and intent. *Drew v. United States*, 118 U.S. App.D.C. 11, 331 F.2d 85 (1964). If the Hearing Committee and the Board had given even cautious consideration to the Fox affidavit, which contains extensive material placing the courthouse incident in perspective, then the connection between the threatened violence and Adler's proposed testimony would surely have become more readily apparent.

We therefore conclude that the Board's assessment of the harassment offense as an isolated incident—a perception which we find flawed even under the Board's own

limited frame of reference—is undermined by the Board's failure to consider the contents of the Fox affidavit. We now consider the effects of that failure, which we believe constitutes error of law, on the Board's finding that moral turpitude has not been proved.

## VII

■ Moral turpitude is not easy to define.[7] This court has discussed the concept on a number of recent occasions including, sequentially, *In re Colson, supra; In re Wolff, supra;* and *In re Campbell*, 522 A.2d 892 (D.C.1987) (*per curiam*). Three alternate definitions, articulated in *Colson* and repeated in *Wolff* and *Campbell*, are as follows:

(1) The act denounced by the state offends the generally accepted moral code of mankind;

(2) The act is one of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man; or

(3) Conduct contrary to justice, honesty, modesty, or good morals.

*Colson*, 412 A.2d at 168; *Wolff*, 490 A.2d at 1119; *Campbell*, 522 A.2d at 894. Obstruction of justice inherently involves moral turpitude. *Colson*, 412 A.2d at 1165.

■ We agree with the Hearing Committee that threatening a witness, which is closely related to obstruction of justice in any event, is "deeply offensive to the moral code of our community, and indeed any community that hopes to remain civilized." As the Committee so eloquently put it,

the trappings of law and due process, of which we are rightly so proud—and which are so essential to our true security and our estimate of ourselves as a civilized society—would be substantially undermined by an attitude that viewed such conduct as anything less than deeply immoral. Such conduct, even when engaged in by a layman, involves "moral turpitude."

---

7. "If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and mor-

al turpitude seems to mean little more than morally immoral." *Jordan v. DeGeorge*, 341 U.S. 223, 239, 71 S.Ct. 703, 712, 95 L.Ed. 886 (1951) (Jackson, J., dissenting).

We also find it appropriate to address, for the Board's guidance, contentions made by counsel for Shillaire before the Board on the issue of moral turpitude. Counsel argued that his client's conduct was less serious than that in *In re Manville*, 494 A.2d 1289 (D.C.1985) (*Manville I*); 538 A.2d 1128 (D.C.1988) (*en banc*) (*Manville II*). Manville was convicted of a homicide during a burglary, and, as counsel suggests, this court has nevertheless ordered that he be admitted to our Bar. Manville committed his crimes long before he became an attorney, however, and his admission to practice was predicated on a finding that he has been rehabilitated since then. Shillaire, on the other hand, threatened a witness while he was a member of our Bar, thus surely breaking faith in the most fundamental way with those who entrusted him with the privilege of membership in a profession which rightly expects more. "Violations of the law assume a different symbolic dimension when committed by those sworn to uphold it." *Manville II, supra,* 538 A.2d at 1135–36, quoting *Moral Character, supra,* 94 YALE L.J. at 587.

█ Counsel for Shillaire contended that Shillaire had mental health problems which dissipated any moral turpitude. As the Hearing Committee correctly observed, however, a finding of a mental or emotional condition which would explain and somehow temper Shillaire's behavior must be based on evidence in the record, not on something that a federal judge or a Michigan disciplinary authority did for undisclosed reasons elsewhere.

█ Counsel also attempted to mitigate the gravity of what Shillaire did on the grounds that he was angry when he did it. Assuming that anger may be a mitigating factor with reference to an isolated outburst, the choleric miscreant stands on no more favorable footing than his more placid counterpart when he speaks and acts as Shillaire allegedly did for a substantial period of time.

### VIII

We must finally address the question of the appropriate action for the court to take where, as here, determinations by the Board which we have held to be legal error have led it to exclude significant probative evidence from its consideration and to take an unduly constricted view of the relevance of other evidence. Obviously, in the light of the preceding discussion, we view the showing that Shillaire's offense involved moral turpitude as formidable, perhaps sufficiently so, as the Hearing Committee found, to warrant disbarment without further proceedings.

The fact remains, however, that we do not have before us a Report and Recommendation of the Board which analyzes all of the evidence, including the Fox affidavit and Shillaire's apparent failure to contest it. Although we and the Board must assess the same paper record, and although it is frankly difficult for us to discern how, on the basis of the record as a whole as it now stands, a finding of no moral turpitude could be sustained, we nevertheless think it appropriate to give the Board another opportunity to assess the evidence in conformity with the legal principles which we have expounded here. Accordingly, we remand the case to the Board on Professional Responsibility for further proceedings consistent with this opinion.

As to the proper procedures on remand, we think that, in the light of the numerous opportunities which Shillaire has had to contest the Fox affidavit, he has been accorded all the process that he is due. We nevertheless leave it to the sound discretion of the Board to determine whether the record should now be reopened to permit introduction of additional exculpatory or extenuating materials, except to state that if it is reopened, the Board should also take appropriate steps to obtain from Bar Counsel, at least, the evidence which he withheld from the Hearing Committee on the grounds (with which we disagree) that it was more prejudicial than probative. Bar Counsel is requested to cooperate with any such request.

REMANDED.