**In re Richard P. PERRIN, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**Nos. 90–BG–997, 93–BG–344.**

District of Columbia Court of Appeals.

Argued June 28, 1995.

Decided Aug. 10, 1995.

---

Leonard H. Becker, Bar Counsel, Washington, DC, for Office of Bar Counsel.

Alan F. Holmer, Washington, DC, for respondent.

Before SCHWELB, FARRELL, and RUIZ, Associate Judges.

SCHWELB, Associate Judge:

The Board on Professional Responsibility has recommended that Richard P. Perrin be suspended from the practice of law for three years, *nunc pro tunc* to August 16, 1990. Neither Bar Counsel nor Perrin has filed an exception to the Board's Report and Recommendation. Perrin having been disbarred in New York, and a Hearing Committee having recommended disbarment in the District of Columbia, a close question is presented as to whether he should also be disbarred in this jurisdiction. On balance, however, we adopt the recommendation of the Board.

## I.

For a period of approximately five years ending in 1986, enterprises run by one John Galanis, a convicted felon, defrauded thousands of investors of millions of dollars in connection with a series of real estate ventures. Galanis' role in these ventures was concealed from the investors, and false promises and representations were made with regard to their financial prospects.

Perrin provided legal services to Galanis and his enterprises, first as a partner of a prominent District of Columbia law firm and subsequently as a member of a new firm—Mason, Perrin & Kanofsky—which Perrin had helped to found, and of which he was a "name" partner. The extended controversy regarding Perrin's activities, which has now been addressed by courts and disciplinary authorities both in New York and in the District, has centered upon Perrin's role in Galanis' fraudulent activities, and specifically on the question whether Perrin knew (or deliberately shielded himself from knowledge) of the false representations made by Galanis and his associates in relation to the real estate offerings.[1]

---

1. We quote the Board:
   Respondent was the attorney ... who was primarily responsible for the preparation of the private placement memoranda (PPM) for at least 13 of these real estate limited partnerships. Respondent admits that he "wrote and, with Galanis, supervised the preparation of the PPMs, which contained misrepresentations and omitted material facts." The PPMs pre-

   pared by Respondent did not disclose that Galanis, a previously convicted felon, was a promoter of the partnership and they contained financial projections that were beyond reasonable expectation and unwarranted by existing circumstances. If an individual is an officer or otherwise significantly involved in an organization as a "promoter," the criminal history of the individual is material and must be dis-

On March 12, 1990, after a grand jury had returned a 105–count indictment against him and others, Perrin entered a plea of guilty in New York to a single misdemeanor violation of § 352(c)(2) of that state's General Business Law. Specifically, Perrin admitted that he had participated in a scheme to obtain money by making "promises and representations as to the future, which were beyond reasonable expectation and unwarranted by existing circumstances." [2] On June 20, 1990, the judge sentenced Perrin to imprisonment for one year and fined him $17,500. Perrin served over five months at the Rikers Island Correctional Facility.

On August 16, 1990, this court .suspended Perrin from practice pending final disposition of the proceedings against him and directed the Board on Professional Responsibility to determine whether Perrin's offense involved moral turpitude. On May 3, 1991, the Board concluded that the offense did not` involve moral turpitude *per se*,[3] but referred the case to a Hearing Committee for a full evidentiary hearing, with directions, *inter alia*, to determine whether Perrin's actual conduct involved moral turpitude and . to recommend appropriate discipline.

After completing his investigation, but before the proceedings before the Hearing Committee began, Bar Counsel and Perrin "struck a deal" [4] under which Bar Counsel was to charge Perrin solely with a violation of the disciplinary rule prohibiting dishonesty. It was further agreed that Perrin would admit to the charge, that Bar Counsel would recommend Perrin's suspension from prac-

tice until this court reinstated Perrin,[5] and that Perrin would not object to this recommendation.[6] Perrin agreed to waive certain defenses in regard to the scope of his plea in New York. An essential feature of the agreement was that the parties would present a limited evidentiary record, focused upon Perrin's conviction in New York.

In conformity with this agreement, Bar Counsel charged Perrin with having violated former DR 1–102(A)(4) ("conduct involving dishonesty, deceit and misrepresentation") and Perrin formally admitted that violation. The Committee held a hearing in January and February 1993 at which Perrin and others testified, and it then took the case under advisement. On March 8, 1993, shortly after the completion of the hearing but prior to the Hearing Committee's decision, Perrin was disbarred by the Appellate Division of the Supreme Court of New York on the basis of his conviction in that state of a "serious crime." [7]

The Hearing Committee's comprehensive and thoughtful report was issued on March 29, 1994. The Committee found that Perrin was not a credible witness, and that Perrin's "self-serving claims that he was totally deceived by the principals of [Galanis' enterprises]," were "not believable." The Committee also rejected Perrin's claim that "he is innocent of any wrongdoing and pleaded guilty only out of exhaustion and desperation."

The Committee stated that it did not believe that Perrin "intended to defraud any-

---

closed. The need to disclose .Galanis' involvement was discussed between Galanis, Mason and Respondent, and it was determined that there was no need to disclose the participation of Galanis because Respondent and others were told that Galanis was acting merely as a consultant and did not have authority to make decisions or to control any entity.

2. Unfortunately, no ·proffer was made by the prosecutor which set forth Perrin's precise role with particularity, and it is difficult to establish exactly what unlawful conduct Perrin admitted . in his plea.

3. This court has subsequently held that no misdemeanor conviction can be found to involve moral turpitude *per se*. *In re McBride*, 602 A.2d 626 (D.C.1992) (en banc).

4. The phrase is Bar Counsel's.

. 5. It was contemplated that the Hearing Committee would consider Perrin's petition for reinstatement together with the issues referred to it by the Board. The Committee, however, declined on jurisdictional grounds to consider the reinstatement petition.

6. Other provisions of the agreement are not germane to our disposition, and we do not enumerate them.

7. In June 1993, this court directed the Board to recommend whether reciprocal discipline should be imposed. See Part III of this opinion, *infra*.

one, or *knew* that a fraud was occurring." (Emphasis in original.) The Committee also found that Perrin's conduct was not characterized by "baseness, vileness or depravity," and concluded that, "on balance," it did not involve moral turpitude. Nevertheless, the Committee recommended disbarment because, *inter alia*, Perrin had admitted "conduct involving dishonesty, deceit and misrepresentation" in violation of DR 1–102(A)(4), because his actions constituted "serious dishonest conduct," and because he was involved, in the course of practicing his legal specialty, in an illegal scheme that resulted in the loss of millions of dollars to innocent investors.

Perrin's attorney filed exceptions to the Hearing Committee's report and, on November 8, 1994, the Board issued its Report and Recommendation.[8] The Board agreed with the Committee that moral turpitude had not been shown by clear and convincing evidence, but disagreed with the recommendation that Perrin be disbarred. The Board recommended, instead, that Perrin be suspended for three years, *nunc pro tunc* to August 16, 1990, which was the date on which he was initially suspended following his conviction in New York.[9]

## II.

■ No party filed an exception to the Board's Report pursuant to D.C.Bar R. XI, § 9(e). Nevertheless, in light of the difficulty of the questions presented, this court set the case for oral argument on the regular calendar. Bar Counsel, who appeared personally, and Perrin's attorney both urged the court to impose the sanction recommended by the Board. No opposing position was presented, although the forceful opinion of the Hearing Committee provided the court with an alternative point of view.

In *In re Goldsborough,* 654 A.2d 1285 (D.C.1995), we recently addressed the applicable scope of review:

Turning to the question of the proper sanction, we are required to

adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.

D.C.Bar R. XI, § 9(g). The deferential standard mandated by this provision becomes even more deferential where, as here, the attorney has failed to contest the proposed sanction.

*Id.* at 1288. In this case, neither Perrin nor Bar Counsel opposes the Board's recommendation. The lack of any dispute among the litigants does not, however, vitiate the court's responsibility to do justice. *Id.* n. 6 (citation omitted).

Although we find much with which we can agree in the Board's literate submission, we are constrained to express our disagreement with some of the reasoning which led the Board to make its recommendation. The Board stated that it was accepting, as on this record it was required to accept, *see In re Shillaire,* 549 A.2d 336, 342 (D.C.1988), the Hearing Committee's factual findings and credibility determinations, but there appears to be some question whether it really did so. The Board, for example, apparently credited Perrin's claim that he believed that Galanis was merely a consultant, and found support for that position in the testimony of Perrin's partner, Helen Kanofsky; the Hearing Committee, which heard the witnesses, found both Perrin and Ms. Kanofsky to be lacking in credibility, and in particular "did not find Respondent's testimony that he had not known that Galanis played a role requiring disclosure to be persuasive." The Board asserted that Perrin "has cooperated fully in the disciplinary proceeding and in the investigation of his former clients," without noting in this regard the Hearing Committee's laconic finding that Perrin was not a "particularly credible" witness.[10] The Board found

---

8. The contents of the Board's Report and Recommendation are discussed in greater detail in Parts II and III of this opinion.

9. Notwithstanding Perrin's disbarment in New York, the Board declined to recommend disbar-

ment as "reciprocal discipline." See Part III, *infra.*

10. The presentation of "not particularly credible" testimony, under oath, before a disciplinary body does not, in our view, constitute "full coop-

that "Respondent has admitted his guilt and expressed his remorse"; but the Hearing Committee, which heard Perrin testify, *see Shillaire, supra,* 549 A.2d at 343, found that he was now essentially claiming, notwithstanding his guilty plea, "that he is innocent of any wrongdoing and pleaded guilty only out of exhaustion and desperation."

We also disagree with the Board's apparent view that Perrin's guilty plea may well be consistent with innocence, and therefore is not especially significant.[11] Recently, in *In re L.L.,* 653 A.2d 873 (D.C.1995), we rejected a trial court's similar assessment of a litigant's guilty plea, notwithstanding the fact that the judge in that case had the opportunity to hear the litigant's testimony and assess his credibility. In the present case, the Hearing Committee, which heard from Perrin directly, rejected the self-serving explanation of the plea which the Board appeared to accept, and the reasoning of *In re L.L.,* applies *a fortiori. See also Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977) ("[s]olemn declarations [of guilt] in open court carry a strong presumption of verity").

In light of the foregoing, we have scrutinized the Board's recommendation with some care. We conclude, however, that even if those parts of the Board's discussion which we find unpersuasive are removed from the calculus, the Board's recommended disposition is reasonable. The essence of the Board's position is contained in the following paragraph of its report:

> The Board has been unable to find disciplinary cases involving facts precisely or even closely paralleling the circumstances involved in the instant matter. There is no

exact formula for reaching the recommended period of suspension. We have taken into account the various aggravating and mitigating circumstances discussed above along with the gravity of the offense, and the need to protect the public, the courts, and the legal profession. *See In re Haupt,* 422 A.2d 768, 771 (D.C.1980). The most difficult factor to assess and compare to other disciplinary cases is Respondent's state of mind in committing the violation—the same issue which plagued the hearing committee. Unlike respondents in other cases involving dishonesty and misrepresentation, Respondent here seems, in effect, to admit to reckless or negligent misrepresentations as opposed to deliberate acts of dishonesty. (Compare, for example, *In re Hutchinson,* 534 A.2d 919 (D.C. 1987)). Because the Board believes that the record supports this characterization, it has based its recommendation on it. Respondent's acts were not impulsive or isolated (*e.g., In re Kent,* 467 A.2d 982 (D.C.1983)) and at the same time, we do not believe that they were deliberate and calculated to deceive. The absence of this level of intent, however, does not excuse the violation but does serve to mitigate the level of sanction which seems appropriate.

The Board also noted that "by the time of the court's decision in this matter, Respondent will have been suspended for a period of time nearly equivalent to the minimum period a disbarred attorney must wait before seeking reinstatement." Because courts must recognize the practical consequences of their actions, we view the length of Perrin's suspension to date as an important consideration.[12]

---

eration." Moreover, as the Board noted, the New York prosecutor believed that Perrin was not being candid with respect to the role in Galanis' activities of Perrin's former partner and codefendant, Arthur D. Mason.

11. The Board wrote that it
   has not given great weight to the fact that a defendant caught up in the coils of a complicated federal and state investigation entered a guilty plea to a single misdemeanor in order to dispose of a 105–count indictment against him. Faced with such an indictment, many "not guilty" or "innocent" persons might well opt for a misdemeanor plea.

12. The Board did not "perceive any basis for imposing a requirement that Respondent furnish proof of rehabilitation as a condition of reinstatement." This aspect of the Board's decision gives us pause, especially in light of the Hearing Committee's assessment of the credibility of some of Perrin's claims. Bar Counsel has represented to the court, however, that as a practical matter, proceedings in which a suspended attorney must prove fitness to practice take a very substantial time to complete. *See In re Steele,* 630 A.2d 196, 202 (D.C.1993) (Farrell, J., concurring) (stating that this court "would welcome suggestions by the Board and Bar Counsel for expedition of [the reinstatement] process"). Given the devastating

The Hearing Committee found that fraudulent conduct was not established by clear and convincing evidence, and we must accept that finding. In that respect, this case differs from such cases as *e.g., In re Gil,* 656 A.2d 303 (D.C.1995) and *In re Goffe,* 641 A.2d 458 (D.C.1994) (per curiam), in which the sanctioned attorneys forged signatures and engaged in other similar fraudulent conduct, and from *In re Shorter,* 570 A.2d 760 (D.C. 1990) (per curiam), in which the respondent, who had been previously disciplined, engaged in willful tax evasion and in a pattern of dishonest dealing. *Id.* at 766, 771. In this case, the Board considered all of the relevant factors in recommending the appropriate discipline, *see, e.g., Goffe, supra,* 641 A.2d at 464, and we cannot say that the three-year suspension recommended by the Board would "foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C.Bar R. XI, § 9(g).

### III.

■ Following Perrin's disbarment in New York, this court directed the Board to determine whether imposition of reciprocal discipline would be appropriate. Section 11(c) of D.C.Bar R. XI provides that "[r]eciprocal discipline *shall* be imposed" unless the attorney demonstrates, by clear and convincing evidence, that one of the five enumerated exceptions applies.[13] (Emphasis added.)

The Board addressed the issue of reciprocal discipline, in part, as follows:

> On one level, it would be easiest to merely adopt the New York disciplinary system's sanction and avoid any independent analysis of this complex and troubling case. The Board has not chosen that course.

> Bar Counsel and the Hearing Committee have devoted extensive time and energy to examining the facts underlying Respondent's conviction. The Board has also given this matter extensive thought. In light of the resources expended in this jurisdiction, the Board believes that the court should reach a decision ... which is independent of the reciprocal matter.

We essentially agree with this analysis.[14]

On its face, Section 11(c) requires the court to impose reciprocal discipline in *every* case in which a member of our Bar is disciplined elsewhere unless the attorney proves that at least one of the exceptions applies. Literal application, however, leads to absurd results. According to the strict terms of the Rule, we would be obliged to apply reciprocal discipline no matter how far our own proceedings

---

consequences which Perrin has already had to endure, including several months of incarceration and five years of suspension, and also considering his previous unblemished record, we accept the Board's view that Perrin is unlikely to transgress again and that proof of fitness should not be required.

**13.** These exceptions are as follows:

(1) The procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or

(2) There was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistently with its duty, accept as final the conclusion on that subject; or

(3) The imposition of the same discipline by the Court would result in grave injustice; or

(4) The misconduct established warrants substantially different discipline in the District of Columbia; or

(5) The misconduct elsewhere does not constitute misconduct in the District of Columbia.

**14.** The Board went on to state that

[t]he presumption of imposing identical discipline would be overcome because the sanction of disbarment is essentially beyond the outer limit of the range of sanctions for similar misconduct in this jurisdiction. In the alternative, the court could override the foreign sanction by a determination that the New York disciplinary proceeding was unfair in that Respondent was not allowed to introduce evidence in mitigation, since the referee viewed such proffered evidence as an attempt to challenge the basis of Respondent's conviction.

Because we dispose of the reciprocal discipline issue on other grounds, we need not reach the issues raised by the passage from the report quoted in this footnote. In fairness to our sister jurisdiction, however, we note that the record as presented by the Board, and as supplemented by Perrin's post-argument submission, does not establish by clear and convincing evidence that the New York disciplinary authorities denied Perrin's rights protected by the Due Process Clause. *See* CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 3.4, at 116 (1986) (second court's prerogative of rejecting the first state's findings on the ground that first state's procedures were seriously defective is "very rarely exercised").

had progressed, or even if they had been completed and if this court had already imposed a different sanction of its own, unless there was a major and substantial difference between the foreign state's practices and our own. In other words, if this court suspended an attorney for three years on January 1, and another jurisdiction suspended him for two years on February 1, then we would be obliged presumptively to suspend him for two years, notwithstanding our previous imposition of a different sanction. Moreover, if the other jurisdiction had a reciprocal discipline rule similar to our rule, then it too would be presumptively obliged to conform its sanction to the District's.[15] One might even posit a "renvoi" as between the two jurisdictions.

Where, as in this case, the District has conducted its own comprehensive proceedings, and where the Hearing Committee had already held an evidentiary hearing on the allegations against the attorney at the time Perrin was disbarred elsewhere, it simply makes no sense to disregard the Committee's findings and the Board's recommendation in favor of the other jurisdiction's sanction.

Each jurisdiction has its own statutes and rules. If the District's proceedings, based on its own standards and a careful evaluation of the attorney's conduct in light of those standards, conclude with the selection of one sanction, then it would surely be irrational to impose, instead, a different sanction which was selected on the basis of a different factual record under another jurisdiction's laws and rules. To paraphrase the Supreme Court of Florida, "[w]e are not bound by the discipline imposed by the [New York] court, and must analyze and deal with respondent's improprieties according to the standards of [the District of Columbia], not of the foreign jurisdiction." *The Florida Bar v. Abrams,* 402 So.2d 1150, 1153 (Fla.1981) (per curiam).

Although this court subscribes to the familiar doctrine that the language of statutes (and rules) is to be accorded its ordinary meaning, *see, e.g., James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 45–46 (D.C.1989), "we must not ... make a fetish out of plain meaning." *Id.* at 46. "Courts do not wallow in literalism where the plain language of a statute would lead to absurd consequences which the legislature could not have intended." *Id.* (citations omitted). "[E]ven when the plain meaning did not produce absurd results but merely an unreasonable one plainly at variance with the policy of the legislation as a whole, this [c]ourt has followed that purpose, rather than the literal words." *Id.* (quoting *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)) (internal quotation marks omitted).[16] Because we are not prepared to construe Section 11(c) as requiring us to permit foreign discipline to trump the results of an exhaustive original disciplinary proceedings here, we agree with the Board that reciprocal discipline need not be imposed in this case.

## IV.

For the foregoing reasons, Richard Perrin is hereby suspended from practice in the District of Columbia, *nunc pro tunc* to August 16, 1990.

*So ordered.*[17]

---

15. Some such cases might be picked up by exception 4 to Section 11(c), see note 13, *supra,* but that exception surely could not embrace all of them.

16. Moreover, Rule 11(c) was promulgated by this court. We therefore have greater latitude than we would have with regard to a statute or agency rule to decide that it does not apply in a particular unusual set of circumstances.

17. It appears to be uncontested that in 1992, Perrin filed the affidavit required by D.C.Bar R. XI, § 14(f).