**In re Daniel J. SLATTERY,
Jr., Respondent.**

**A Member of the Bar of the
District of Columbia.**

No. 98–BG–1147.

District of Columbia Court of Appeals.

Argued Oct. 7, 1999.
Decided Jan. 25, 2001.

Russell Twist, with whom William J. Hardy and Prescott M. Lassman, Washington, DC, were on the brief, for respondent.

Traci M. Tait, Assistant Bar Counsel, with whom Leonard H. Becker, Bar Counsel, ware on the brief, for the Office of Bar Counsel.

Elizabeth J. Branda, for the Board on Professional Responsibility.

Before SCHWELB, RUIZ, and REID, Associate Judges.

RUIZ, Associate Judge:

This disciplinary case is before us on exceptions by respondent, Daniel J. Slattery, Jr., a member of the District of Columbia Bar and a Federal Administrative Law Judge, and by Bar Counsel, to the Report and Recommendation of the Board on Professional Responsibility (the "Board"). The disciplinary charges stem from Slattery's appropriation of $10,262.30 from a bank account in the name of a fraternal organization and his efforts to conceal that act. It is uncontested that Slattery removed the money from the account; the principal issue is whether his doing so was in violation of the disciplinary rules. The Board Report, adopting the findings of the Hearing Committee, found Slattery to have violated District of Columbia Rules of Professional Responsibility 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation). The Board recommended a three-year suspension with proof of fitness prior to readmittance to the District of Columbia Bar, but Bar Counsel urges that disbarment is the appropriate sanction for Slattery's misconduct. Slattery challenges our authority to discipline him under Rule 8.4(b), contests the finding of misconduct, and argues that no sanction should be imposed.

### Facts

The Board adopted the following findings of the Hearing Committee:[1] In the 1950s, the Ancient Order of the Hibernians (the "Order"), an Irish fraternal organization, began to collect funds to establish a national facility in Washington, D.C. Around the same time, members of the John Barry Division, a local chapter of the Order, began to collect separate donations to help furnish the national facility, often referred to by long-standing members as the "furniture fund." Over time, as the

---

1. Slattery did not testify before the Hearing Committee.

local chapter began to mistrust the manner in which its members perceived the national organization was handling the national fund, they refused to report to the national organization concerning the status of the local fund. The furniture fund existed continuously from the 1950s under the name Hibernian National Memorial Building Fund at Citibank, F.S.B., and its predecessor banks. At all times, the funds were held in an interest-bearing account (the "Account"). Interest was reported under the Order's taxpayer identification number, which the Order permitted the local chapter to use.

Slattery joined the John Barry Division in 1992, and was soon elected president of the chapter. Slattery never functioned as legal counsel to the national organization nor the local chapter. Slattery's father and Eugene Corkery had been the authorized signatories on the Account and Slattery replaced his father as co-signor on the Account upon his death in 1989. Slattery neither contributed any of his own funds to the Account, nor was his father known to have made any significant personal contribution to the Account. Until 1995, Corkery permitted Slattery to be the sole recipient of Account statements, as Slattery's father had been.

As of September 15, 1992, the Account balance for the furniture fund stood at $9,963.46, which increased periodically from accruing interest. Between September 16, 1992 and July 19, 1994, Slattery withdrew and used a total of $10,262.30 from the furniture fund for his personal benefit. Slattery neither sought authorization for use of the funds nor disclosed the withdrawals. Thereafter, Slattery filed a civil suit against the Order, in a personal capacity on behalf of himself and his sister, seeking to disgorge nationally collected funds. The suit was not authorized by the local chapter or any other Hibernian organization. On February 9, 1995, Slattery gave false and evasive answers in a deposition to questions concerning the Account for the furniture fund.

Slattery's appropriation of the furniture fund was subsequently detected, and Slattery eventually reimbursed the Order for the funds he took. No criminal charges were ever filed against Slattery for his appropriation of the funds.

## I. Jurisdiction

Slattery challenges the jurisdiction of the Board and this court to address the rules violations asserted by Bar Counsel, arguing that in this disciplinary proceeding he is in effect being tried and convicted for the crime of theft. Relying on *United States v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), and *In re Stiller*, 725 A.2d 533 (D.C.1999), he contends that neither the Board nor this court is authorized to determine whether he has in fact violated a criminal statute.

In *Quarles*, the United States Supreme Court held that Congress has no power to subject a discharged serviceman to trial by court-martial for offenses committed while in the service. 350 U.S. at 22, 76 S.Ct. 1. Rather, as a civilian, the serviceman could not be deprived of the constitutional safeguards protecting persons accused of crime in a federal court, notably trial by jury. *See id.* Thus, the Court limited the scope of Article 3(a) of the Uniform Code of Military Justice, which provided that a discharged serviceman could be charged and convicted in the military tribunal. *Quarles* is inapposite because neither the Board nor this court actually convicts an individual during disciplinary proceedings.

■ In *Stiller*, the division opinion noted by way of dictum that "neither the hearing committee nor the Board nor this court is authorized to decide whether Mr. Stiller violated [a federal statute]. Under our legal system, that decision is entrusted exclusively to federal courts and federal juries. Any suggestion by us that Mr. Stiller violated (or did not violate) [that statute] would have no legal force or effect; at best, we would be rendering only an advisory opinion if we even attempted

to address the question." *Stiller*, 725 A.2d at 539 (footnote omitted).[2] Slattery seizes on this language to argue that by determining that he has violated Rule 8.4(b) by committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness, absent an actual conviction of the substantive crime, this court would be rendering an improper advisory opinion and usurping the function of juries to decide guilt. We are not persuaded by this argument, which erroneously equates criminal and disciplinary proceedings. The penal and bar disciplinary regimes have different burdens of proof (beyond reasonable doubt versus clear and convincing evidence), different consequences as a result of an adverse determination (potential deprivation of liberty versus deprivation of a property interest), and different disciplinary goals (punishment and/or deterrence versus policing the profession). Accordingly, we do not understand *Stiller* to signal such a radical departure from our disciplinary jurisprudence. Rather, *Stiller* simply enunciates a first principle of our disciplinary jurisprudence under Rule 8.4(b): we discipline for "conduct, not for any supposed violation of a criminal statute with which [a lawyer] has never even been charged." *Id.* at 540. *Cf.* D.C.Code § 11–2503.[3]

▮ Rule 8.4(b) provides that it is professional misconduct to "[c]ommit a criminal *act* that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." (Emphasis added.) Similarly, Rule 8.4(c) subjects a bar member to discipline for professional misconduct if the lawyer "en-

gage[s] in conduct involving dishonesty, deceit, or misrepresentation." There is no requirement in either provision of the rule that an attorney actually have been convicted of a crime for the rule to apply. *Cf.* D.C.Code § 11–2503(a), *supra* note 3; D.C.Bar R. XI, § 10 (disciplinary proceedings based upon conviction of crime). Although Rules 8.4(b) and (c) are applicable in cases in which an attorney has been convicted of a crime, an attorney is not immune from bar discipline under Rule 8.4 merely because a complainant or prosecuting authority has chosen not to bring criminal charges. Rather, an attorney may be disciplined for having engaged in conduct that constitutes a criminal act that reflects adversely on his or her fitness as a lawyer under Rule 8.4(b) or engaging in dishonest or deceitful conduct, despite not having been prosecuted for such actions. *See In re Gil,* 656 A.2d 303, 305 (D.C.1995); *In re Pierson,* 690 A.2d 941, 947 (finding violation of Rule 8.4(b) for misappropriation of client funds). A finding by clear and convincing evidence that the conduct at issue was a criminal act that merits disciplinary sanction is something altogether different than a finding beyond a reasonable doubt that the conduct merits conviction and a criminal penalty. The first is within our disciplinary province; the second is not.

## II. *Procedural Claims*

▮ Notwithstanding that bar discipline does not result in a criminal conviction, it is well-settled that an attorney who is the subject of such proceedings is entitled to procedural due process safeguards.

---

2. The decision in *Stiller* is subject to a pending petition for rehearing or rehearing en banc.

3. D.C.Code § 11–2503(a) provides:

 When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar

from practice. Upon reversal of the conviction the court may vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and such person shall thereafter cease to be a member. Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment.

*See In re Thorup*, 432 A.2d 1221, 1225 (D.C.1981); *In re Colson*, 412 A.2d 1160, 1164 (D.C.1979) (en banc). The procedural requirements which apply in attorney disciplinary proceedings are analogous to those of other "contested cases." *Thorup*, 432 A.2d at 1225; *In re Williams*, 464 A.2d 115, 119 (D.C.1983). The burden of proving the charges rests with Bar Counsel and factual findings must be supported by clear and convincing evidence. *See Thorup*, 432 A.2d at 1225. Slattery argues that he was denied rights under Board Rules 7.1[4] and 7.19,[5] Bar Rule XI, § 8(c)[6] and the Due Process clause of the Fifth Amendment when Bar Counsel, without notice, allegedly changed his theory of theft by trick to one of theft by conversion.

## A. Disciplinary System Rules

■ Slattery contends that during the evidentiary hearing before the Hearing Committee, Bar Counsel proffered a new theory of theft, "theft by conversion and misappropriation," as opposed to the theory of "theft by trick" of which Bar Counsel, Slattery alleges, initially notified him. The Specification of Charges ("Specification") prepared by Bar Counsel and delivered to Slattery relates the factual basis on which the charges rest and then identifies the specific rules Bar Counsel alleges to have been violated. Notably, paragraphs six and nine of the Specification read as follows:

6. Although Respondent was a member of the Order at the time of the with-

4. Board Rule 7.1 requires that the charging petition "shall be sufficiently clear and specific to inform the attorney of the alleged misconduct."

5. Board Rule 7.19 states:
No amendment of any petition or of any answer may be made except on leave granted by the appropriate Hearing Committee Chair. Whenever, in the course of a formal hearing, evidence shall be presented upon which another charge or charges against respondent might be made, it shall not be necessary to prepare or serve an additional petition with respect thereto, but upon motion by respondent or by Bar Counsel, the Hearing Committee Chair may continue the

drawals, he was not a signatory on the Account. At no time was Respondent authorized to withdraw funds from the Account.

. . .

9. On March 29, 1995, Eugene D. Corkery, a member of the Order and signatory to the Account, filed an affidavit of forgery with Citibank . . . .

Slattery argues that he interpreted paragraphs six and nine together to allege that he obtained the money through the trick of "forgery." Slattery contends that Bar Counsel thereby violated Board Rules 7.1 and 7.19 because the charge in the Specification was not sufficiently clear to inform him of the alleged misconduct.

The Board agreed that the first sentence of paragraph six may be read to suggest a theory of theft by trick, but also noted that the second sentence of that paragraph suggests a theft by conversion. In any event, the Specification makes no explicit mention of either forgery or theft by trick, merely theft. Moreover, it is paragraph eleven that delineates the exact charge, in pertinent part, as follows:

11. Respondent's conduct violated the following Rules of Professional Conduct (the "Rules"):

A. Rule 8.4(b), in that Respondent committed a criminal act (theft) that reflects adversely on the lawyer's honesty, trustworthiness and/or fitness as a lawyer.[7]

hearing. After providing respondent reasonable notice and an opportunity to answer, the Hearing Committee may proceed to the consideration of such additional charge or charges as if they had been made and served at the time of service of the original petition.

6. D.C.Bar.Rule XI, § 8(c) reads in pertinent part: "The petition shall be sufficiently clear and specific to inform the attorney of the alleged misconduct."

7. The Specification also charged Slattery with violation of:

Although "an attorney can be sanctioned only for those disciplinary violations enumerated in formal charges," *In re Smith*, 403 A.2d 296, 300 (D.C.1979), we agree with the Board that the Specification fairly put Slattery on notice of the charges against him.[8]

## B. Fifth Amendment Due Process

Slattery principally relies on *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), for the argument that his Fifth Amendment due process rights were violated when Bar Counsel, without notice, allegedly changed his theory of theft from theft by trick to one of theft by conversion. Although, as explained above, we consider that this factual contention is not borne out by the language of the Specification, we also reject Slattery's due process argument grounded on *Ruffalo*. In *Ruffalo*, the charges against the attorney were amended to add a count based on a defense that the attorney had presented during his testimony. *See* 390 U.S. at 550, 88 S.Ct. 1222. The Supreme Court held that "[t]his absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process." *Id.* at 552, 88 S.Ct. 1222. Ruffalo, an Ohio lawyer who handled a number of Federal Employer's Liability Act ("FELA") cases, was charged by the bar association with a number of violations of the disciplinary rules including his use of a part-time employee named Orlando to solicit FELA clients. *See id.* at 546, 88 S.Ct. 1222. Ruffalo and Orlando both testified that Orlando was employed only to investigate the cases and did not solicit clients on behalf of Ruffalo. *See id.* During the course of the proceeding, however, it was revealed that Orlando was employed by one of the railroads against which Ruffalo

had brought some of his cases. *See id.* The bar association thereafter added an additional charge against Ruffalo in the midst of the hearing, that Ruffalo's employment of Orlando to investigate against his employer was "deceptive in nature and was morally and legally wrong." *Id.* at 547, 88 S.Ct. 1222. Ruffalo was given a continuance to respond to the new charge. *See id.* In disbarring Ruffalo, the Ohio Supreme Court concluded that "one who believes that it is proper to employ and pay another to work against the interests of his regular employer is not qualified to be a member of the Ohio bar." *Mahoning County Bar Ass'n v. Ruffalo*, 176 Ohio St. 263, 199 N.E.2d 396, 401 (1964).

The case came before the Supreme Court on appeal from a subsequent disbarment, as reciprocal discipline, by the United States Court of Appeals for the Sixth Circuit. *See In re Ruffalo*, 13 Ohio Misc. 131, 370 F.2d 447 (6th Cir.1966), *rev'd*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968). In reversing the Sixth Circuit's decision, the Court stated:

> In the present case petitioner had no notice that his employment of Orlando would be considered a disbarment offense until *after* both he and Orlando had testified at length on all the material facts pertaining to this phase of the case. As Judge Edwards, dissenting below, said, "Such procedural violation of due process would never pass muster in any normal civil or criminal litigation."

> These are adversary proceedings of a quasi-criminal nature. The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no

B. Rule 8.4(c), in that Respondent engaged in conduct involving dishonesty, fraud, deceit and/or misrepresentation; and C. Rules 3.3(a)(1), in that Respondent knowingly made one or more false statements of material fact to a tribunal.

8. Slattery also argued to the Hearing Committee that a new charge was being made against him. There is no evidence in the record that Slattery asked the Hearing Committee for a continuance pursuant to Rule 7.19.

opportunity to expunge the earlier statements and start afresh.

How the charge would have been met had it been originally included in those leveled against petitioner by the Ohio Board of Commissioners on Grievances and Discipline no one knows.

This absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprived petitioner of procedural due process.

*Ruffalo*, 390 U.S. at 550–52, 88 S.Ct. 1222 (citations and footnotes omitted).

This court has had the opportunity to consider the scope of *Ruffalo's* holding. In *In re Smith*, 403 A.2d 296 (1979), the respondent was charged with violations under the former Disciplinary Rules 6–101(A)(3) (neglecting a legal matter entrusted to him), and 7–101(A)(1) & (2) (failing to seek the lawful objectives of his client or to carry out a contract for professional services). *See id.* at 297. The matter was referred to a Hearing Committee. *See id.* At the hearing, respondent, who appeared *pro se*, stated: "[If] there's anything I've done wrong as a lawyer, it is in the using of subterfuge in getting the money for the work that I had already done for these people." *Id.* As a result of this and similar statements at the hearing, formal charges were filed against the respondent for violating DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation). *See id.* The Hearing Committee, citing *Ruffalo*, dismissed the charge under DR 1–102(A)(4) believing it to be barred by lack of due process. *See id.* The Board on Professional Responsibility reinstated the charge and found the respondent guilty. *See id.* at 298.

The respondent in *Smith* urged this court to reverse the Board's holding with respect to the violation of DR 1–102(A)(4) "because respondent had not been charged with fraud when he admitted to fraud." *Id.* at 300. We noted that "[u]nder this reading of *Ruffalo* an attorney could immunize himself from discipline for the bulk of his professional indiscretions by confessing freely at any time after being charged with some trivial violation." *Id.* We did not read *Ruffalo* as holding that Ruffalo was "denied due process because the bar association failed to give him timely notice of an additional charge of violating the disciplinary rules." *Id.* at 301. Rather, we understood *Ruffalo* as holding that due process was violated "because the bar association failed to give [Ruffalo] prior notice that his conduct would amount to, in the words of the Supreme Court, a 'disbarment offense,' with the consequence that Ruffalo was trapped into admitting that he had committed a disciplinary violation." *Id.*

We were encouraged in this reading of *Ruffalo* by the Court's citation to *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), for the proposition that Ruffalo "may well have been lulled 'into a false sense of security'...." *Ruffalo*, 390 U.S. at 551 n. 4, 88 S.Ct. 1222. In *Bouie*, two black students had taken seats in a section of a restaurant that was by custom reserved for white patrons only. *See* 378 U.S. at 348, 84 S.Ct. 1697. No signs were posted. *See id.* After the students had seated themselves, a restaurant employee chained off the section and posted a "no trespassing" sign. *See id.* The students were asked to leave and, when they refused, were arrested. *See id.* They were charged and convicted under a South Carolina statute that prohibited "entry upon the land of another ... after notice from the owner or tenant prohibiting such entry." *Id.* n. 1. The Supreme Court reversed, holding that the students' due process rights were violated when South Carolina applied a criminal sanction to what had been non-criminal conduct under the statute when it occurred. *See id.* at 355, 84 S.Ct. 1697. As we noted in *Smith*, the law had "provided [the students] no notice that their conduct would be subject to criminal sanctions prior to their engaging in it." *Smith*, 403 A.2d at 301 (citing *Bouie*, 378 U.S. at 355, 84 S.Ct.

1697). We further cited approvingly Justice White's concurrence in *Ruffalo* which "makes the same point quite forcefully." *Id.*

> [M]embers of a bar can be assumed to know that certain kinds of conduct, generally condemned by responsible men, will be grounds for disbarment. This class of conduct certainly includes the criminal offenses traditionally known as *Malum in se.* It also includes conduct which all responsible attorneys would recognize as improper for a member of the profession.

*Ruffalo, supra,* 390 U.S. at 555, 88 S.Ct. 1222 (White, J., concurring). In holding that Smith's discipline for violating DR 1–102(A)(4) did not violate the rule of *Ruffalo,* we noted that "[i]n the case before us, respondent admitted to fraud while testifying at a hearing on his alleged neglect. The Rules of Professional Conduct are quite clear on this point: respondent's fraudulent actions were proscribed. No newly declared standards of professional conduct were applied retroactively to respondent's actions after he had admitted to them." *Smith,* 403 A.2d at 302. In *In re James,* 452 A.2d 163 (D.C.1982), we reiterated this understanding: "*Ruffalo* rests on the premise that the amendment of charges created an impermissible trap since, at the time of the proceedings, the attorney could not have known that the defense he asserted would subject him to disbarment." *Id.* at 168 n. 3.

Such a situation is not present in the case at bar. Theft, whether by trick or by conversion, is a criminal act that constitutes a violation of Rule 8.4(b). Moreover, as in *James,* "[t]he instant case involves no amendment of charges. The issues involve the scope of the *original* charges and whether the Hearing Committee's statements to respondent regarding the matters of concern to them would suffice to

vitiate any shortcomings in the charging document." *Id.*

Slattery directs us to *In re Thorup,* 432 A.2d 1221 (D.C.1981), wherein, citing *Ruffalo,* we found "difficulties [to] stem from the Hearing Committee's actions in amending the gravamen of the charge based on the testimony of [the] respondent." *Id.* at 1225. In *Thorup,* the respondent was found to have neglected a legal matter entrusted to him in violation of DR 6–101(A)(3). *See id.* at 1222. The original basis of the charge was that the court-appointed Thorup had failed to take actions to prepare a defense for his client, such as filing a motion to suppress or interviewing alibi witnesses. *See id.* at 1222–23. The Hearing Committee accepted a copy of the docket from the client's criminal case into evidence and ruled that the docket established a prima facie case against respondent. *See id.* at 1225. The docket showed only that respondent had failed to file a suppression motion and that a motion had subsequently been filed by successor counsel and granted by the trial court. *See id.* The Committee then switched the burden to respondent to explain his actions. *See id.* Before the Hearing Committee Thorup testified that he had no notes in his file and little recollection concerning the government's evidence against his client, potential witnesses or the defendant's alibi. In rejecting the Board's recommendation for a public censure, we noted that, in effect, the charge metamorphosed from failure to represent to failure to recollect and keep notes—"an assumed misconduct neither charged nor founded in the Disciplinary Rules." *Id.*[9] Thus, *Thorup* can be reconciled with our interpretation of *Ruffalo* in *Smith:* Thorup was not on notice that failure to keep adequate notes violated the disciplinary rules.

---

9. The *Ruffalo* claim was not the central rationale for which the court reversed the Board's imposition of discipline in *Thorup.* The court's principal concern in *Thorup* was the fact that the Committee switched the burden of proof from Bar Counsel to the respondent, by relying on entries in the criminal trial docket as establishing a prima facie case of neglect and requiring Thorup to respond. *See* 432 A.2d at 1225.

In sum, our analysis in *Smith* counsels that Slattery's due process claim under *Ruffalo* must fail. In the instant case, the Rules of Professional Conduct are clear that the theft of funds to which one is a fiduciary, whether that theft is accomplished by trick or misappropriation, is "conduct which all responsible attorneys would recognize as improper for a member of the profession." *Ruffalo*, 390 U.S. at 555, 88 S.Ct. 1222. Slattery was on notice that theft, by whatever means, is a violation of the standards of professional conduct, was aware of the nature of the charges against him (theft), and therefore was not lulled into a false sense of security and, thereby, trapped. *Cf. Smith*, 403 A.2d at 302. Therefore, we reject Slattery's argument that his Fifth Amendment due process rights were violated by an alleged change in the legal theory of theft.[10]

### III. Board's Report and Recommendation

We review the Board's recommendation in accordance with D.C.Bar R. XI, § 9(g) (1998), which provides that "the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted."

### A. Rule 8.4(b)

■ Rule 8.4(b) provides that it is professional misconduct for a lawyer to "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Slattery argues that there is not substantial record evidence to support the Board's finding of liability under Rule 8.4(b) because without evidence as to the Account's ownership or purpose, there is no "substantial evidence" that he made an unauthorized use of such funds within the meaning of the theft statute, D.C.Code § 22–3811. "In construing the phrase 'criminal act' for purposes of Rule 8.4(b), this court properly may look to the law of any jurisdiction that could have prosecuted respondent for the misconduct." *In re Gil*, 656 A.2d 303, 305 (D.C.1995). The Account was opened and maintained at a bank in Washington, D.C., and we therefore look to District of Columbia law. In the District of Columbia, a person commits the crime of theft "if that person wrongfully obtains or uses the property of another with intent: (1) To deprive the other of a right to the property or a benefit of the property; or (2) To appropriate the property to his or her own use or to the use of a third person." D.C.Code § 22–3811(b).

■ Although neither the Hearing Committee nor the Board could ascertain which Hibernian entity owned the funds at issue, there is no record evidence, other than Slattery's own unsworn representations, that he owned the funds or that he

---

**10.** We also reject Slattery's assertion that exclusion of a check register which purported to show that at an unspecified date, and on one occasion, a check for $10 was written by his mother drawn on the Hibernian account, allegedly establishing his family's exercise of control over the account, constitutes prejudicial error. At oral argument, and in a subsequent motion, Slattery raised the issue whether his counsel's performance before the Hearing Committee was so deficient as to deny him due process; an ineffective assistance of counsel claim. His counsel's alleged ineffectiveness stems from an apparent tactical decision not to have Slattery testify before

the Hearing Committee and to defend on procedural grounds rather than presenting a substantive defense. Respondent attorneys in bar disciplinary proceedings are entitled to procedural due process, *see Thorup*, 432 A.2d at 1225, and the rules permit charged attorneys to be represented by counsel. Slattery cites no case, nor has our research produced any, however, in which effective assistance of counsel was held to be a due process requirement in bar disciplinary proceedings, such that counsel's deficient performance, if sufficiently prejudicial, could require a new proceeding.

withdrew the funds for the benefit of the Hibernians or its organization. There also is no evidence that Slattery ever made a contribution to the Account, nor is there evidence that his father, a prior signatory, ever asserted a claim to any portion of the funds, or made a significant personal contribution to, or withdrew funds from, the account. Likewise, bank statements addressed to Slattery's home showing the name and tax identification number of the Account provided notice that ownership of the funds belonged to someone other than Slattery. The evidence clearly and convincingly supports the Board's finding, which we adopt as our own, that "the owner of the funds was not the Respondent and that he was fully on notice when he withdrew the funds that he was not personally entitled to use of the funds in the account." [11] Accordingly, we find that Slattery's actions, consisting of the intentional appropriation of Hibernian funds constitutes a "criminal act" that negatively reflects on Slattery's "honesty, trustwor-

11. On September 16, 1992, Slattery made a cash withdrawal from the Account in the amount of $1000, and on December 28, 1992, another one in the amount of $1000. On September 1, 1993, Slattery caused a bank check to be drawn upon the Account, payable to Daniel Slattery, in the amount of $4,500. On July 19, 1994, Slattery caused a bank check to be drawn upon the Account, payable to the "Hibernian National Memorial Bldg. Fund," in the amount of $3,762.30, which closed the Account. This check was deposited into Slattery's personal bank account.

12. One month after Slattery closed out the funds in the Account, he filed suit in his personal capacity to recover more than $500,000 from the national organization in funds that had been set aside for the purchase of a national headquarters. The case was dismissed with prejudice and the court granted the Hibernians more than $60,000 in costs. Slattery failed to pay the costs and the court granted an order compelling his response to discovery in an effort to collect. Slattery gave a deposition in which he provided the following evasive responses to questions regarding the Account:

> Q: Did you maintain any funds in the District of Columbia relating to the funds to be provided to a home?
> A: No.

thiness [and] fitness as a lawyer." D.C.Bar R. 8.4(b).

## B. Rule 8.4(c)

A violation of Rule 8.4(c) requires a showing that a respondent was dishonest, deceitful, fraudulent, or misrepresented the truth. Dishonesty is a lack of honesty, probity, integrity and straightforwardness. *In re Shorter*, 570 A.2d 760, 767–68 (D.C.1990). Even "what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty." *Id.* at 768. Deceit is the active suppression of facts by one bound to disclose them, or the giving of "information of other facts which are likely to mislead for want of communication of that fact." *Id.* at 777 n. 12. The Board found, by clear and convincing evidence, that Slattery was dishonest and deceitful based on his theft of funds and the sworn testimony he gave in a deposition following the lawsuit he filed against the Order: [12]

> Q: Do you have any money that you maintain in any capacity that was related to the Hibernians?
> A: No.
> Q: Did you not at some point take over responsibility for maintaining accounts for money to deposit which was to be used for the home?
> A: No.
> Q: Did you take over any responsibilities relating to monies which would be used to further the interest of the Order upon your father's death?
> A: No.
> Q: It is said that you have $8,000 to $10,000 maintained in an account which was to be used for furnishing the home; is that not true?
> A: It is not true.
> Q: My question, to be clear, Do you in any way have any responsibility associated with maintaining an account or deposits of money which have been contributed for purposes of the Ancient Order here in Washington, the Barry Division, or anything related to that?
> A: No.
> Q: Have you no knowledge?
> A: No.
> Q: None whatsoever?
> A: That's correct.

This deposition occurred after Slattery had withdrawn the entire balance from the Ac-

We conclude that the record shows, by clear and convincing evidence that [Slattery's] conduct was dishonest on two occasions. First, the appropriation of the funds was dishonest because it reflected a lack of integrity. Second, [Slattery] demonstrated a lack of honesty when giving his deposition testimony. [Findings para. 15]. We also find [Slattery's] conduct to be deceitful, by clear and convincing evidence, on two occasions. First, when he removed the funds from the account, he was bound to disclose this information to the account owner. He did not do so, but suppressed these facts and was deceitful when asked about the condition of the account. [Findings para. 11]. Second, when giving testimony under oath during his deposition, he had a duty to truthfully answer the questions put to him, and by suppressing this information he was deceitful.

Whether or not Slattery was an authorized signatory to the Account, he had no instructions or authorization from the Hibernians to withdraw the funds or to place them in his account for personal use. Slattery did not disclose his removal of Account funds to anyone and actively concealed his transactions when inquiry about the Account was made at a meeting of area Hibernian executives. "[H]is entire conduct in transferring funds to his account was marked by deceit." *Gil,* 656 A.2d at 306. Similarly, Slattery's deposition testimony, given before discovery that the Account funds had been depleted, is not merely equivocal but misleading, false and deceitful. We agree with the Board that clear and convincing facts confirm Slattery violated Rule 8.4(c).

### IV. Sanction

Having found no due process or other procedural violation and having concluded that there is clear and convincing evidence

to support the Board's findings of disciplinary violations, we turn to consider the appropriate discipline. The Hearing Committee, concluding that Slattery had violated Disciplinary Rules 8.4(b) and 8.4(c), recommended that Slattery be disbarred. The Board, although adopting *in toto* the Hearing Committee's findings of fact and conclusions of law, recommended that Slattery be suspended for three years and required to show fitness before readmission. The Board's recommended sanction, a three year suspension with fitness requirement, is the most serious sanction that can be imposed short of disbarment. *See* D.C. Bar R. XI, § 3(a). The Board argues that its recommended sanction is consistent with the facts of this case and with prior discipline for similar misconduct. Bar Counsel excepts to the Board's departure from the Hearing Committee's recommendation, as did a dissenting member from the Board's "Report and Recommendation," and urges that the appropriate sanction is disbarment, arguing that accepting the Board's recommended discipline is unwarranted and would foster a tendency toward inconsistent dispositions for comparable misconduct.

 A recommendation of the Board with respect to a proposed sanction comes to this court with a strong presumption in favor of its imposition. *See In re Goffe,* 641 A.2d 458, 463 (D.C.1994) (per curiam). "Generally speaking, if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed." *Id.* at 463–64. Under D.C.App.R. XI, § 9(g)(1), we are to adopt the Board's recommended sanction "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." In determining the appropriate sanction, the Board is to review all relevant factors, including 1) the nature of the violation; 2) the mitigating and ag-

count and after he had received the 1099–INT tax forms identifying the account as belonging

to the Hibernians.

gravating circumstances; 3) the need to protect the public, the courts and the legal profession; and 4) the moral fitness of the attorney. *See Goffe,* 641 A.2d at 464. In measuring consistency between cases, it is necessary to compare the "gravity and frequency of the misconduct, any prior discipline, and any mitigating factors such as cooperation with Bar Counsel, remorse, illness or stress." *In re Steele,* 630 A.2d 196, 199 (D.C.1993). We are cognizant that comparing one case to another is an inherently imprecise process, and the Board's expertise in disciplinary matters is entitled to considerable deference. *See In re Haupt,* 422 A.2d 768, 771 (D.C.1980) (per curiam). Nevertheless, although Rule XI "endorses the Board's exercise of broad discretion in handing out discipline that is subject only to a general review for abuse in that discretion's exercise," this Court retains the ultimate choice of sanction. *Goffe,* 641 A.2d at 464 n. 7. (quoting *In re Haupt,* 422 A.2d at 771).

Slattery has two prior informal admonitions, one for neglect and inadequate preparation under former Disciplinary Rules 6–101(A)(2) and 6–101(A)(3) and one for a conflict of interest under DR 5–105 for representing sisters as defendants in a criminal case. The Board noted the difference between the former misconduct and Slattery's current misconduct. Although the Board Report states that Slattery's prior disciplinary history should be taken into account in determining the appropriate sanction, it did not explicitly consider the prior discipline when evaluating Slattery's case against other discipline cases. The Board considered as mitigation the fact that "[t]here is controversy among the witnesses representing the various Hibernian factions as to who owned the funds and whether [Slattery] was entitled to them," even though it clearly found that Slattery was neither the owner of the funds, nor had a right to take the funds for personal use. The Board also considered as a mitigating factor that Slattery has repaid the Hibernians. Bar Counsel, on the other hand, urges that we view the two

prior informal admonitions as aggravating circumstances. Bar Counsel also suggests that Slattery's filing of a frivolous lawsuit demanding more than $500,000 from the national Hibernian organization constitutes another aggravating circumstance. Finally, Bar Counsel contends that the fact that Slattery eventually repaid the money he took from the Account carries little weight, given that he used over $10,000 of funds entrusted to him for his own purposes without the Hibernians' knowledge or consent.

Another mitigating factor considered by the Board in this case is that Slattery's misconduct was not practice-related. We have held that "dishonest actions committed outside of the representation of a client ... need not necessarily be sanctioned to the same degree as similar acts committed in the course of representation." *In re Kennedy,* 542 A.2d 1225, 1230 (D.C.1988). "The relation of an act to the practice of law illuminates and properly focuses [the appropriate discipline] inquiry ... the essential purpose of ... which is to question the continued fitness of a lawyer to practice his profession." *Id.* (citation and quotation omitted). *See also In re Kent,* 467 A.2d 982, 985 (D.C.1983) (considering that "incident of dishonesty was completely unrelated to the practice of law" as a mitigating factor). In *Kennedy,* we also cautioned that the distinction between fitness and punishment must be maintained. We noted that although "[d]eterrence is also a legitimate goal of disciplinary proceedings ... clients in general and the administration of justice are the primary focus of protection." 542 A.2d at 1230. Because "the role of a lawyer is to represent and advise clients in a fiduciary capacity and to carry out the administration of justice," practice-related violations of disciplinary rules have more "impact on the representation of clients and the practice of law in general." *Id.* at 1230–31.

The Board concluded that the strong presumption in favor of disbarment which

applies in intentional misappropriation cases is not present in the instant because client funds are not involved, citing *In re Addams,* 579 A.2d 190 (D.C.1990) (en banc). The Board is correct that in *Addams* we were centrally concerned with the attorney-client relationship: "[t]he administration of justice under the adversary system rests on the premise that clients and the court must be able to rely without question on the integrity of attorneys." *Id.* at 193. In *Addams,* we also noted that "the principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general." *Id.* at 194 (quoting *In re Wilson,* 81 N.J. 451, 409 A.2d 1153, 1154 (1979)). Although Slattery did not stand in an attorney-client relationship with the Hibernians, as President of the local chapter with access to the Account, he was an attorney in a position of trust.[13] The *Addams* presumption in favor of disbarment for misappropriation of funds has not been extended to cases not involving client funds, but there is a structural similarity between the attorney-client fiduciary relationship sought to be protected in *Addams* and the trustee relationship of Slattery to the Hibernians with respect to the Account. At the very least, the near-automatic rule of disbarment of *Addams* signals the seriousness with which the disciplinary system should deal with an attorney's deliberate taking of fiduciary funds to convert them to a personal use.

The Board relies upon *In re Kent,* 467 A.2d 982 (D.C.1983), *In re Moore,* 691 A.2d 1151 (D.C.1997), and *In re Perrin,* 663 A.2d 517 (D.C.1995), in support of its recommendation for a three year suspension with a fitness requirement. In *Kent,* the respondent, who possessed an unblemished professional record, pleaded guilty to the misdemeanor charge of ·taking property without right. *See* 467 A.2d at 983; D.C.Code § 22–1211, *replaced by* D.C.Code § 23–801 (theft). The charge arose from an incident in which Kent, suffering from "severe transient emotional distress," entered a department store and "proceeded from department to department randomly grabbing store merchandise and stuffing it into her briefcase or purse ... in an open fashion, aware that sales clerks and store detectives were observing her actions." 467 A.2d at 983. The Hearing Committee concluded that she had violated DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and, "in light of the aberrational nature of respondent's actions and her mental state at the time of the incident," recommended a thirty-day suspension. *Id.* at 983–84. A majority of the Board, however, recommended that the suspension be for one year and a day. *See id.* at 984. Finding the Board's recommended suspension was disproportionate in light of the facts of the case which "clearly indicate[d] that respondent's actions were prompted by a neurotic desire to be caught rather than a desire for personal profit," we also noted "the absence of

13. Although the Hearing Committee made a finding that Slattery was a fiduciary of the John Barry Division on the Account, the Board made no such finding because the Hearing Committee's findings did not clearly establish who the legal owner of the Account was among various Hibernian entities and a finding that Slattery was a fiduciary was unnecessary to conclude he had violated the disciplinary rules. Although the Board is correct that a finding that Slattery was a fiduciary is unnecessary to determine that Slattery violated the disciplinary rules in this instance, we believe it is relevant to the appropriate discipline to be imposed. Members of the Order understood the Account to be a "trust account" and that its funds could be used only for the purposes for which the Account was established. Eugene Corkery, the second signatory on the Account, considered himself to be "a trustee on th[e] account" with a "duty to the Ancient Order to protect the money." Slattery was "the primary trustee and signatory to all transactions on th[e] account." It is clear from the record that just as an attorney stands in a fiduciary relationship to a client, so did Slattery, as a primary signatory to the Account, stand in a fiduciary relationship as regards the Account to some Hibernian entity, regardless of which precise Hibernian entity owned the Account.

any relation between respondent's conduct and her professional responsibilities" in adopting a thirty day suspension. *Id.* at 985. Thus, in *Kent* we considered not only the aberrational nature of Kent's actions in the context of a theretofore spotless disciplinary record and the lack of relation between the dishonesty and her practice of law, but also relied heavily on Kent's mental state at the time of the incident and the fact that "she ha[d] already undergone what amounts to a self-imposed suspension of over 2 years." *Id.* at 985.

In *Moore*, the respondent was found guilty, pursuant to a plea agreement, to one count of willful failure to file federal income tax returns, a misdemeanor. *See* 691 A.2d at 1151–52. When IRS investigators inquired about the returns, Moore directed an attorney in his office to lie on his behalf. In addition, Moore was found to have testified falsely concerning his income in divorce proceedings. *In re Moore*, D.N. 94–93 at 9 (BPR June 19, 1996). The Board found that he had committed multiple violations of DR 1–102(A)(4) (dishonest conduct and misrepresentations), and DR 1–102(A)(5) (conduct prejudicial to the administration of justice). *Moore*, 691 A.2d at 1151. The Board having concluded that Moore "exhibited a pattern of dishonesty and misrepresentation over a lengthy period," *Moore*, D.N. 94–93 at 9, we followed the Board's recommendation and suspended the respondent in *Moore* for three years. *Moore*, 691 A.2d at 1152.

In *Perrin*, after a grand jury had returned a 105 count indictment against respondent and others, the respondent entered a plea of guilty to a single misdemeanor of New York's General Business Law. *See* 663 A.2d at 519. Perrin admitted that he participated in a scheme to make unreasonable and unwarranted representations in connection with a series of real estate ventures.[14]

*See id.* Bar Counsel and Perrin "struck a deal" under which Bar Counsel charged Perrin solely with a violation of DR 1–102(A)(4) ("conduct involving dishonesty, deceit and misrepresentation"), recommended suspension as a sanction and Perrin agreed not to object to Bar Counsel's recommendation. *See id.* While the case was pending, the Appellate Division of the Supreme Court of New York disbarred the respondent. *See id.* Nevertheless, in *Perrin* we adopted the Board's recommendation that the respondent be suspended for three years, adopting the Board's finding that the presumptive reciprocal sanction of disbarment should be mitigated because "we [did] not believe that [respondent's acts] were deliberate and calculated to deceive." *Id.* at 521.

In response, Bar Counsel argues that *In re Gil*, 656 A.2d 303 (D.C.1995), provides the correct measure of discipline in the case at bar. In *Gil*, we held that an attorney who engages in the theft of funds "unrelated to the practice of law may nonetheless violate Rule 8.4(b)." *Id.* at 304 (quoting *In re Kennedy*, 542 A.2d 1225, 1228 (D.C.1988)). The facts of *Gil* and the present case are very similar. Gil stole funds from a long-time friend after she had engaged his assistance in transferring bank funds held in four certificates of deposit ("CDs") to a joint account held by her father and her, and then to her personal account. *See id.* at 304. Gil's friend then left the country on urgent personal business and Gil carried out her instructions to close the four CDs and to transfer the funds. *See id.* However, he prepared another power of attorney and a letter, both purportedly from his friend's father, which he caused to be falsely notarized. *See id.* Gil then closed two remaining CDs and drew a blank check, provided by his friend to pay notary fees, to his personal order in the amount of $14,500. *See id.*

**14.** The respondent provided legal representation to an individual who defrauded thousands of investors of millions of dollars in connection with a series of real estate ventures. The respondent was disbarred by the State of New York.

Gil deposited all of the remaining redeemed funds in his personal checking account, which he used to pay personal obligations and to purchase a new automobile. *See id.* Upon his friend's return, Gil confessed to appropriating her funds, provided a promissory note for the principal and interest, and repaid the principal. *See id.* We held that Gil had engaged not only in the theft of his friend's monies, *see* Rule 8.4(b), but also in conduct involving dishonesty and deceit in violation of Rule 8.4(c). *See id.* at 305. Gil was disbarred for these actions.[15] *See id.* at 306.

In this case, Slattery had access to a bank account containing approximately $10,000 which he had good reason to believe no one else was monitoring. Slattery had no instructions from the Hibernians to move the funds and he certainly had no authority to deposit the funds in his personal account. Slattery exceeded his authority to obtain the funds on deposit and Slattery's conduct after transferring the funds to his account was marked by deceit. Had Slattery been convicted of felony theft, disbarment would have been automatic.[16] As the Board Report notes, "[Slattery's] was not a single, impulsive act," and Slattery's misrepresentations were not for the purpose of helping others, but to protect his own financial benefit. Although Slattery has not had an unblemished disciplinary record, we do not regard the previous informal admonitions for actions completely unrelated to the current disciplinary proceedings as egregious aggravating factors, but neither do we discount them completely from our calculus. We also consider as an aggravating factor the fact that Slattery filed a frivolous lawsuit against the Order seeking to disgorge over $500,000 to which he clearly was not entitled, which reflects poorly on his professional performance as an attorney. Although *Kennedy* instructs that the fact Slattery's misconduct was not in the course of legal representation is a mitigating factor, we do not understand *Kennedy* to require that in such a circumstance as this our sanction must be *substantially* mitigated. Nor are we persuaded that Slattery's violation of a fiduciary relationship and dishonesty during his deposition are completely unrelated to the practice of law or the administration of justice.

In sum, the present case is easily distinguishable from *Kent* because Kent was found to have violated only the predecessor of Rule 8.4(c), DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and not also of violating Rule 8.4(b). Moreover, unlike in *Kent*, here there is no evidence of mental illness or stress that prompted Slattery's actions. Likewise, whereas in *Perrin* we did not believe the respondent's acts to be "deliberate and calculated to deceive," Slattery's conduct was deliberate and deceitful. Of the cases relied upon by the Board in which a suspension was ordered, *Moore* is perhaps most similar to the instant case in that the respondent was found to have violated both DR 1–102(A)(4) (dishonest conduct and misrepresentations), and DR 1–102(A)(5) (conduct prejudicial to the administration of justice), by engaging in continuing dishonesty and misrepresentation over a period of time. *See Moore*, 691 A.2d at 1151. Bar Counsel's reliance on *Gil* as requiring disbarment is very persuasive. Although the

---

**15.** Although there was an issue in *Gil* whether an attorney-client relationship existed between Gil and his friend, we decided that his misconduct was "grave enough to require disbarment" regardless of whether Gil acted in the course of an attorney-client relationship. *See id.* at 304.

**16.** Bar Counsel also points the court to *In re Goffe*, 641 A.2d 458 (D.C.1994), an attorney dishonesty case which included not only "a

pattern of dishonesty and lying but blatant fabrication and creation of evidence." *Id.* at 460. Goffe proffered fabricated and altered evidence to the IRS, made false statements to IRS counsel, and lied under oath to the Tax Court. *See id.* at 461. This court rejected the Board's recommendation of a one year suspension with fitness and disbarred Goffe. *See id.*

Board considered the facts in *Gil* to be more blatant and aggravated because *Gil* falsified documents and misrepresented facts to access the funds, we note that, whereas in *Gil* the respondent voluntarily confessed to the friend he defrauded and reimbursed the stolen funds, here Slattery reimbursed the funds he appropriated only after he was found out, subsequent to his making false statements during a sworn deposition and concealing his actions.

Notwithstanding our deference to the Board's recommendation, we conclude that *Gil* requires disbarment in this case. Thus, we agree with Bar Counsel and the forcefully dissenting member of the Board that *Gil* is the correct measure of comparison under the facts of this case and hold that a sanction short of disbarment in this case would foster a tendency toward inconsistent dispositions for comparable conduct. *See* D.C.Bar.R. XI, § 9(g)(1). We therefore adopt the Hearing Committee's original recommendation that Daniel J. Slattery, Jr. be disbarred from the District of Columbia Bar.

*So Ordered.*