*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## 20-BG-673

IN RE LAWRENCE D. O'NEILL, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 265702)

On Report and Recommendation
of the Board on Professional Responsibility
(BDN-2019-055)

(Argued March 30, 2022                    Decided June 16, 2022)

Lawrence D. O'Neill, *pro se*.

*Julia L. Porter*, Deputy Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, and *Myles V. Lynk*, Senior Assistant Disciplinary Counsel, were on the brief, for the Office of Disciplinary Counsel.

Before BLACKBURNE-RIGSBY, *Chief Judge*, EASTERLY, *Associate Judge*, and FISHER, *Senior Judge*.

EASTERLY, *Associate Judge*: In 2016, after selling his ownership interest of an Irish company, Adriano Fusco entrusted the proceeds to his Ireland-based, D.C.-barred attorney, Lawrence O'Neill. Mr. O'Neill subsequently failed to transfer to Mr. Fusco all the funds his client was due and told numerous falsehoods for years

about the whereabouts of these funds. Based on these factual findings, the Hearing Committee concluded that Mr. O'Neill had intentionally misappropriated client funds, committed criminal acts of theft and wire fraud, and engaged in flagrant dishonesty in violation of the Rules of Professional Conduct. The Hearing Committee recommended disbarment, not only relying on the presumption of disbarment for intentional misappropriation but also referencing Mr. O'Neill's flagrant dishonesty as an independent basis for this sanction. The Board on Professional Responsibility agreed and adopted in full the Hearing Committee's report and sanction recommendation.

On appeal to this court, Mr. O'Neill ignores the Hearing Committee's factual findings and provides an alternate account of events that is untethered to the record and inconsistent with his prior accounts and admissions. He then makes three legal arguments: (1) "the D.C. Bar has no jurisdiction" to discipline him in relation to his nonlegal business matters in Ireland; (2) he cannot have violated certain Rules of Professional Conduct—specifically, Rules 1.5 and 1.16(d)—that he asserts apply to attorney-client relations, when he was acting only as Mr. Fusco's business advisor; and (3) he cannot have violated Rules 8.4(b) and (c) because he never intended to permanently deprive Mr. Fusco of his funds, remains committed to returning them, and did not engage in any criminal activity.

Mr. O'Neill's jurisdictional argument is irreconcilable with the plain text of the Rules of Professional Conduct. In return for the privilege of D.C. Bar membership, all members agree to conform their conduct to the Rules of Professional Conduct "regardless of where [that] conduct occurs." D.C. R. Prof. Conduct 8.5(a). His arguments that he was not acting as a lawyer and did not act with the purpose to steal Mr. Fusco's money cannot be reconciled with the Hearing Committee's findings of fact, adopted by the Board, and supported by substantial evidence. Likewise, his assurance to this court at oral argument that he was on the cusp of paying Mr. Fusco what he owed is unconvincing in light of the countless similar but false representations he has made. Accordingly, Mr. O'Neill fails to persuade us that he did not violate any Rules of Professional Conduct.

Both the Hearing Committee and the Board recommend that we disbar Mr. O'Neill. We agree that his intentional misappropriation of Mr. Fusco's funds alone justifies disbarment. We further agree that his dishonesty is an independent reason why he cannot remain a member of the D.C. Bar. Over the years Mr. O'Neill has told innumerable untruths to Mr. Fusco, Mark Walsh (the solicitor who attempted to help Mr. Fusco reclaim his funds in Irish court), the High Court of Ireland, the Hearing Committee, and the Board regarding whether he had transferred the funds to his client, why he had not done so, and where the funds were. Mr. O'Neill has

admitted at various points that his representations were untrue, and then turned around and told new falsehoods. If his dishonesty does not qualify as flagrant, then nothing does. To allow him to remain a member of our bar in light of his demonstrated indifference to truth-telling would demean bar membership.

## I. Factual and Procedural History

Preliminarily, we note that we rely on the Hearing Committee's findings of fact, which the Board adopted. Before this court, Mr. O'Neill could have attempted to challenge these factual findings as "unsupported by substantial evidence of record." D.C. Bar R. XI § 9(h)(1); *accord In re Cleaver-Bascombe*, 892 A.2d 396, 401 (D.C. 2006). He did not. Instead, Mr. O'Neill simply ignored the Hearing Committee's factual findings and substituted his own, self-serving narrative. In the absence of a legitimate argument that the Hearing Committee's factual findings were in error, we consider such an argument waived. *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (brackets omitted)).

Mr. O'Neill was admitted to practice law in the District of Columbia in 1979. By 2016, Mr. O'Neill was living in Ireland, where he was not licensed to practice law. Mr. O'Neill held himself out as a "partner" at O'Neill & Company, International Legal Advisors. The firm's letterhead noted that he was "admitted in Maryland, the District of Columbia and before the Supreme Court of the United States" and his signature block included the title of "Esq[uire]" and identified him as an "Attorney at Law." Nowhere did Mr. O'Neill clarify that he was not a licensed solicitor and thus not authorized to practice law in Ireland.

In June of 2016, Mr. O'Neill was hired by Mr. Fusco to represent him in negotiations to extricate him from joint ownership of an Irish company. Mr. O'Neill had previously represented Mr. Fusco's brother in a different matter and had provided him with an engagement letter containing terms of his legal representation, including his hourly fee. Although Mr. Fusco anticipated that Mr. O'Neill would provide him with a similar engagement letter, Mr. O'Neill did not. Nevertheless, Mr. O'Neill provided Mr. Fusco with legal advice about how to proceed. It was decided that Mr. Fusco and his partner would each bid to buy each other out in a process governed by Irish law. In his dealings with the other solicitors involved in the negotiation, Mr. O'Neill referred to Mr. Fusco as his client, made reference to

putting funds in an IOLTA account,[1] and at one point informed other counsel that it would be "negligence" or "malpractice" for him to recommend that Mr. Fusco take a certain course of action.

Mr. Fusco's partner bought Mr. Fusco's share of the company for €325,000. In his capacity as Mr. Fusco's lawyer, Mr. O'Neill received the funds and initially deposited them in his account at Ulster Bank. In the weeks that followed, Mr. O'Neill distributed some of these funds at Mr. Fusco's direction. But he did not account for the remainder, approximately €170,000.[2] The record allows these funds to be traced for some period of time—some went to an overdrawn business checking account, some went to a personal bank account he shared with his wife, some went to an IOLTA account in New York—but ultimately the funds in the Ulster account (and the New York IOLTA account) were depleted. It is unclear where the money

---

[1] IOLTA is an Interest on Lawyer Trust Account. *See In re Haar*, 270 A.3d 286, 291 & n.2 (D.C. 2022). Lawyers barred in the District of Columbia are required to hold entrusted funds in such accounts. *Id.*

[2] Mr. O'Neill originally told Mr. Fusco that he owed him €169,271. Mr. O'Neill came to this number by subtracting from the €325,000 the amount Mr. Fusco had actually authorized Mr. O'Neill to disburse (€65,000 directly to Mr. Fusco, €80,000 to his brother Fabio—which although it was €20,000 more than Mr. Fusco originally authorized, he seems to have subsequently accepted—and €6,000 for taxes) plus the €4,125 in legal fees and €580 in banking fees Mr. O'Neill charged him.

is now.

Mr. O'Neill gave Mr. Fusco multiple reasons for why he did not send Mr. Fusco his money, none of which were true.  In sequence:

- Mr. O'Neill initially said that he had already wired Mr. Fusco the money from the New York IOLTA account (when, in fact, it held only $50.84) and emailed Mr. Fusco fake bank records to back up this story;

- Mr. O'Neill told Mr. Fusco that his bank put the transfer on hold because Mr. Fusco's brother's name was on a "United Nations terrorist watch list" and he induced Mr. Fusco to sign an affidavit disclaiming any relationship with a terrorist using his brother's name;

- Mr. O'Neill again said he had sent the funds or was about to send them and provided Mr. Fusco's solicitor, Mr. Walsh, with fabricated records of wire transfers;

- Mr. O'Neill said he could not pay Mr. Fusco because his New York bank was limiting his withdrawals from his IOLTA account but promised to pay him no later than November 28, 2016, and, when that date passed, no later than December 12, 2016;

- Mr. O'Neill admitted that he had "not been entirely forthcoming" and told Mr. Fusco a new (untrue, *see infra* at 10–11) story, namely that he had "through inattention and negligence . . . temporarily lost control" of his funds to a business acquaintance, Vijay Kumar Raja, and he attached an affidavit purportedly from Mr. Raja acknowledging that the funds had been sent to him in error and promising to repay Mr. O'Neill.

In the meantime, Mr. Fusco sued Mr. O'Neill in Ireland and, on November 25, 2016, obtained a judgment ordering Mr. O'Neill to pay him €169,271 by November 28, 2016. But instead of paying Mr. Fusco, Mr. O'Neill continued to spout falsehoods, not only to Mr. Fusco but also to the High Court of Ireland, for example, representing (falsely) that he had obtained a loan from Chase Bank to repay Mr. Fusco. More promises to pay or representations that he had repaid the money followed—complete with more fabricated bank records and, in one instance, a check (written on his wife's bank account) that bounced. Although Mr. O'Neill had promised the court he would not leave the country, he flew to New York at the end of January 2017. The court subsequently found him in contempt for failing to comply with its order to repay Mr. Fusco, sentenced him in absentia to twenty-eight days of incarceration, and directed him to pay Mr. Fusco's legal fees.

Mr. Fusco pursued Mr. O'Neill to the United States and filed a complaint with an Attorney Grievance Committee in New York; the Committee forwarded the complaint to the D.C. Bar. In April of 2018, the Office of Disciplinary Counsel for the D.C. Bar opened an investigation into Mr. O'Neill's misconduct and asked him to respond to Mr. Fusco's allegations. Mr. O'Neill initially repeated the mistaken-transfer-to-Mr.-Raja story, falsely claimed he had paid Mr. Fusco back in full, and insisted that he had told Mr. Fusco that he was not a licensed lawyer in Ireland and had never acted as one for Mr. Fusco. In March of 2019, he told Disciplinary Counsel that Mr. Fusco's funds had been "stolen" from him, but that he had repaid Mr. Fusco in July 2018. But by the eve of his November 2019 disciplinary hearing, his story had changed yet again, to the one that he now maintains is the real truth: He used Mr. Fusco's funds to pay the legal fees of a friend, Andrew Krieger, who was facing criminal charges in Germany. Mr. Raja supposedly owed Mr. Krieger €200,000 and had agreed to pay Mr. O'Neill back this money in Mr. Krieger's stead.

Mr. O'Neill testified to this version of events at his disciplinary hearing but provided no corroborating evidence. Disciplinary Counsel, on the other hand, presented evidence debunking all of Mr. O'Neill's prior stories about what he had done with the money and supplied the Hearing Committee with copies of Mr.

O'Neill's bank records, which did not reflect a transfer of funds in the amount of €200,000 to Mr. Krieger or his affiliates but instead documented deposits of over $600,000 (including $50,000 from Mr. Krieger's wife) in 2017.

Based on the two days of hearing testimony and more than 700 pages of exhibits, the Hearing Committee found, by clear and convincing evidence, that Mr. O'Neill had violated Rules of Professional Conduct 1.5(b) for failing to provide his client a written agreement stating the basis or rate of his representation; 1.15(a) for failing to keep complete records of entrusted funds and by misappropriating those funds; 1.15(c) for failing to return his client's funds or provide a full accounting of how he had disbursed those funds; 1.16(d) for failing to return his client's funds after the termination of his representation; 3.3(a)(1) for making knowingly false statements to a tribunal; 3.4(c) for knowingly disobeying an obligation under the rules of a tribunal; 8.1(a) for making knowingly false statements to Disciplinary Counsel; 8.4(b) for theft and wire fraud in violation of New York law; 8.4(c) for intentional misrepresentation; and 8.4(d) for engaging in conduct that seriously interfered with the administration of justice.

Based primarily on its determination that Mr. O'Neill had intentionally

misappropriated client funds in the amount of €174,000,[3] the Hearing Committee recommended that Mr. O'Neill be disbarred. The Hearing Committee also observed in that Mr. O'Neill's flagrant dishonesty provided an independent basis for this sanction. The Board adopted in full the Hearing Committee's factual findings and legal conclusions; it likewise recommended disbarment and further recommended that Mr. O'Neill be required to prove that he had paid full restitution as a condition of reinstatement.[4] This timely appeal followed.

## II. Rule Violations

In its report, the Hearing Committee detailed why it concluded that Mr. O'Neill had violated ten different Rules of Professional Conduct: 1.5(b), 1.15(a), 1.15(c), 1.16(d), 3.3(a)(1), 3.4(c), 8.1(a), 8.4(b), 8.4(c), and 8.4(d). Before the

---

[3] The Hearing Committee did not accept Mr. O'Neill's €169,271 figure because it determined that Mr. O'Neill had never "provided any supporting records or information to demonstrate he was entitled" to the €4,125 in legal fees and €580 in banking fees. *See supra* note 2.

[4] The Board noted that Mr. O'Neill had represented on October 8, 2020, that "he had recently sent funds to his solicitor in Ireland to pay [Mr.] Fusco." Approximately eighteen months later, at oral argument before this court, Mr. O'Neill made a similar representation that he had sent the money to his solicitor to pay Mr. Fusco "two months ago."

Board, Mr. O'Neill raised a global jurisdictional challenge but otherwise only contested the Hearing Committee's conclusions of law on targeted grounds:  He disputed that he was acting as an attorney, which he understands to be a prerequisite for a determination that he violated Rules 1.5(b) and 1.16(d) and that he had the requisite intent to steal to support a violation of Rules 8.4(b) and 8.4(c).  On appeal, he renews these arguments.  Like the Board, we address these arguments but otherwise adopt the Hearing Committee's unchallenged determinations regarding Mr. O'Neill's many rule violations.  *See In re Pye*, 57 A.3d 960, 962 (D.C. 2012) (noting that this court may adopt the Board's recommendation without further discussion if it does so for "substantially" the same reasons).

**A. Whether the Board and this court have jurisdiction**

Mr. O'Neill argues that "the D.C. Bar has no jurisdiction" over his case because the activities prompting discipline took place in Ireland,[5] where he was not practicing law, but merely acting as a "legal consultant and advisor based on his extensive international business experience."  In essence, he argues that the

---

[5] Mr. O'Neill overlooks his rule violations for making false statements to the D.C. Hearing Committee and Board.

disciplinary process for attorneys barred in the District, created by this court, D.C. Bar R. Preamble, has no application to individuals who are working overseas in a nonlegal capacity. We review this legal argument de novo, *In re Yelverton*, 105 A.3d 413, 420 (D.C. 2014), and reject it as baseless.

The D.C. Bar's jurisdiction arises from consensual covenant, not geographic location. *See, e.g.*, *In re Ponds*, 888 A.2d 234, 235 n.1 (D.C. 2005) (quoting Rule 8.5(a)) ("[A] lawyer admitted to [the D.C. Bar] . . . is subject to the [District's] disciplinary authority . . . , regardless of where the lawyer's conduct occurs."). In return for the benefits of bar membership, members agree to be bound by Bar Rules and Rules of Professional Conduct, D.C. Bar R. II § 1 (providing that membership in the D.C. Bar is "subject to due compliance with the conditions and requirements of such membership"), and to be subject to the disciplinary authority of this court and the Board, D.C. Bar R. XI § 1(a), no matter where the alleged misconduct occurs, D.C. R. Prof. Conduct 8.5(a).

Furthermore, members are generally bound by Bar Rules and Rules of

Professional Conduct.[6] "It is the duty of every recipient of that privilege at all times and in all conduct, both professional and personal, to conform to the standards imposed upon members of the Bar as conditions for the privilege to practice law," and "[a]cts or omissions by an attorney . . . which violate . . . the rules or code of professional conduct . . . shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship." D.C. Bar R. XI § 2(a) & (b).

Mr. O'Neill voluntarily sought membership in the D.C. Bar in 1979 and has chosen to maintain that membership for over forty years. As a D.C. Bar member, he is subject to the disciplinary authority of the Board and this court. And this court is fully empowered to rescind its "proclamation . . . that the holder [of a D.C. Bar license] is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice . . . ." D.C. Bar Rule II § 2(a).

---

[6] Granted, some Rules of Professional Conduct may contemplate an attorney-client relationship. *See infra* at 17.

## B. Whether Mr. O'Neill was acting as Mr. Fusco's attorney

Mr. O'Neill argues that, because he "never agreed to act nor acted" as Mr. Fusco's attorney, he cannot have violated rules that he understands contemplate an attorney-client relationship, specifically Rules of Professional Conduct 1.16(d) (obligating a bar member to "take timely steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled") and 1.5(b) (requiring a bar member, "before or within a reasonable time after commencing the representation" to "communicate[] to the client, in writing," the "basis or rate of the fee, the scope of the lawyer's representation, and the expenses for which the client will be responsible."). We assume without deciding that these two rules[7] cannot be violated in the absence of an attorney-client relationship, *see In re Gil*, 656 A.2d 303, 304 (D.C. 1995) (noting that whether an attorney-client relationship is a predicate for a Rule 1.15 violation is an open question); *cf. In re Dickens*, 174 A.3d 283, 296 (D.C. 2017) (accepting that proof of an attorney-client relationship is a predicate for a Rule 1.3 violation), and further that whether an attorney-client relationship exists is a question of ultimate fact, which we review de novo. *Id.* We conclude the record amply supports a

---

[7] Mr. O'Neill does not include Rules 1.15(a) and 1.15(c) in this argument.

determination that Mr. O'Neill acted as Mr. Fusco's lawyer.

This court "considers the totality of the circumstances to determine whether an attorney-client relationship exist[ed]." *In re Dickens*, 174 A.3d at 296 (quoting *In re Fay*, 111 A.3d 1025, 1030 (D.C. 2015) (per curiam)) (brackets omitted)). Because "the obligations imposed by the Rules arise from the establishment of a fiduciary relationship between the attorney and client" and "exist independently of contractual rights and duties," an attorney-client relationship may arise in the absence of a written agreement, payment of fees, or even delivery of actual legal advice. *In re Dickens*, 174 A.3d at 296 (internal quotation marks omitted). "All that is required . . . is that the parties explicitly or by their conduct, manifest[ed] an intention to create the attorney[-]client relationship." *Id.* (internal quotation marks omitted). "In that regard, a client's perception of an attorney as his counsel is a consideration in determining whether a relationship exists," *id.* (internal quotation marks omitted), and the burden rests on the attorney to communicate with the client, "preferably in writing" to eliminate any doubt "about whether a client-lawyer relationship still exists." D.C. R. Prof. Conduct 1.3, comment 9.

Here, the record conclusively establishes that Mr. Fusco hired Mr. O'Neill—

who held himself out as an attorney on his letterhead—to act as his attorney. Mr. Fusco learned about Mr. O'Neill from his brother, for whom Mr. O'Neill had done legal work in Ireland. Mr. O'Neill gave Mr. Fusco legal advice about the negotiations regarding the sale of his share of his company, which were governed by Irish law; referred to Mr. Fusco as his client to other attorneys; ultimately received the proceeds of the sale of Mr. Fusco's interest in his company (some of which he moved to an IOLTA account which is supposed to be used solely to hold entrusted funds, *see supra* note 1, only because he was Mr. Fusco's legal representative during the mediation; and charged Mr. Fusco legal fees for his representation.

Mr. O'Neill's argument that he could not have acted as Mr. Fusco's attorney because he was not licensed to practice law in Ireland is misguided. Just because he was not authorized to practice law in Ireland does not mean he could not enter into an attorney-client relationship within the meaning of this court's Rules of Professional Conduct. Accordingly, Mr. O'Neill's challenges to the determination that he violated Rule 1.5(b) and 1.16(d) fail.

### C. Whether Mr. O'Neill intended to steal his client's funds

Lastly, Mr. O'Neill argues that he did not violate Rules of Professional Conduct 8.4(b) and (c) because "[h]e never denied that the funds were owed to Mr. Fusco and has always committed to and remains committed to returning the funds to Mr. Fusco." Mr. O'Neill's argument that he did not commit the crime of theft because he "never had the intent to permanently deprive Mr. Fusco of his funds" ignores the other grounds for concluding that he violated Rules 8.4(b) and 8.4(c), namely by committing wire fraud and exhibiting flagrant dishonesty, *see supra* at 12, respectively. In any event, his attempt to challenge the sufficiency of the evidence supporting his intent to steal is unpersuasive.

Again, our review is de novo. *Yelverton*, 105 A.3d at 420. Rule 8.4(b) states that it is professional misconduct for a lawyer to "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer . . . ." A Rule 8.4(b) violation is not contingent on the existence of criminal charges, much less a criminal conviction. *In re Slattery*, 767 A.2d 203, 207 (D.C. 2001). Instead, there need only be "clear and convincing evidence" that an attorney "engaged in conduct that constitutes a criminal act" and that act "reflects adversely

on his or her fitness as a lawyer." *Id.* ("A finding by clear and convincing evidence that the conduct at issue was a criminal act that merits disciplinary sanction [under Rule 8.4(b)] is something altogether different than a finding beyond a reasonable doubt that the conduct merits conviction and a criminal penalty.").

Because Mr. O'Neill transferred at least some of Mr. Fusco's funds to New York, we, like the Board and the Hearing Committee before us, consider whether his conduct amounted to larceny as defined by New York law.[8] *See In re Gil*, 656 A.2d at 305 (applying the criminal law of where the underlying conduct occurred). Under New York Penal Law § 155.05 (2022), a person commits larceny when, "with intent to deprive[9] another of property or to appropriate[10] the same to himself or to a

---

[8]  Mr. O'Neill does not challenge the Board or the Hearing Committee's reliance on New York's larceny statute.  He argues, however, that Irish law enforcement authorities did not charge him with a crime; as we explain above, that fact is immaterial.

[9]  "Deprive" is statutorily defined to mean either "to withhold . . . or cause . . . to be withheld . . . permanently or for so extended period or under such circumstances that the major portion of its economic value or benefit is lost" or "to dispose of the property in such a manner or under such circumstances as to render it unlikely that an owner will recover such property."  New York Penal Law § 155.00(3) (2022).

[10]  "Appropriate" is statutorily defined in relevant part to mean either "to exercise control . . . permanently or for so extended period or under such circumstances as to acquire the major portion of its economic value or benefit" or

third person, he wrongfully takes, obtains or withholds such property from an owner thereof." *People v. Medina*, 18 N.Y.3d 98, 105 [2011] (internal citation omitted) (explaining larcenous intent equates to a purpose to "exert permanent or virtually permanent control over the property taken, or to cause permanent or virtually permanent loss to the owner of the possession and use thereof."). The mens rea element of larceny may be proved by direct or circumstantial evidence. *People v. Ryan*, 41 N.Y.2d 634, 640 (N.Y. 1977).

The circumstantial evidence of Mr. O'Neill's larcenous intent is overwhelming. He failed to pay Mr. Fusco when Mr. Fusco repeatedly asked for his money. He failed to pay Mr. Fusco when the High Court of Ireland ordered him to do so (and fled Ireland after the court found him in contempt and sentenced him to twenty-eight days of imprisonment). He failed to pay Mr. Fusco after disciplinary proceedings were commenced against him. And, all along, he told one falsehood after another about where Mr. Fusco's funds were and why he could not return them. Mr. O'Neill's six years of inaction and deceit provide ample basis for us to conclude

---

"to dispose of the property for the benefit of oneself or a third person." New York Penal Law § 155.00(4).

that, when he took Mr. Fusco's money,[11] he committed the crime of larceny under New York law and violated Rule 8.4(b). And the same evidence clearly and convincingly supports a determination that he violated Rule 8.4(c) (prohibiting an attorney from "[e]ngag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation").

### III. Sanction[12]

"[T]he system of attorney discipline, including the imposition of sanctions, is the responsibility and duty of this court." *In re Baber*, 106 A.3d 1072, 1076 (D.C. 2015) (per curiam) (internal quotation marks omitted). That said, we generally defer to a sanction recommendation from the Board, *id*., and Bar Rules provide that "this Court 'shall adopt the recommended disposition of the Board unless to do so would

---

[11] Even if we were to believe that Mr. O'Neill now intends to return the funds to Mr. Fusco, *but see supra* note 4 and *infra* note 14, it would not matter. When deciding if there has been a Rule of Professional Conduct violation, we assess a lawyer's conduct "on the basis of the facts and circumstances as they existed at the time of the conduct in question," not after the fact. D.C. R. Prof. Conduct, Scope, comment 3.

[12] Mr. O'Neill has been disbarred in Maryland for separate conduct, *Attorney Grievance Comm'n of Md. v. O'Neill*, 271 A.3d 792 (Md. 2022), and Disciplinary Counsel has filed a motion in this court, still pending, for reciprocal discipline.

foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *In re Vohra*, 68 A.3d 766, 771 (D.C. 2013) (quoting D.C. Bar R. XI, § 9(h)(1)). Disbarment is the presumptive sanction for intentional misappropriation of client funds, *see In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc), and having concluded that Mr. O'Neill so violated this rule, both the Hearing Committee and the Board recommended that Mr. O'Neill be disbarred on this basis. Other than rehashing his unpersuasive argument that he was not acting as Mr. Fusco's attorney when he received Mr. Fusco's funds, *see supra* Section II.B., Mr. O'Neill provides us with no reason for departing from the presumptive sanction for this rule violation, and we do not discern any. We therefore adopt the Board's recommendation.

The Board and Hearing Committee also acknowledged that Mr. O'Neill's flagrant dishonesty provided an independent basis for this disbarment. We agree. As we recently reaffirmed in *In re Mazingo-Mayronne*, "honesty is basic to the practice of law," and "continuing and pervasive indifference to the obligations of honesty in the judicial system" warrants disbarment. 20-BG-601, ---A.3d--- at *1 (D.C. June 9, 2022). Unfortunately, a number of respondents whose "repeated and protracted dishonesty" compelled disbarment have come before this court. *See id.*

at *2 (citing cases). Mr. O'Neill's six years of lies to Mr. Fusco, Mr. Walsh, the High Court of Ireland, Disciplinary Counsel, the Hearing Committee, and the Board more than qualify him to be placed in this ignominious company. His pattern of telling a falsehood, admitting that it was not true, and then telling another falsehood cannot be described as anything other than "flagrant dishonesty." *Cf. Cleaver-Bascombe*, 892 A.2d at 412 (recognizing that dishonesty is especially "intolerable" when it is done "for the purpose of attempting to cover up previous dishonest misconduct"). Accordingly, disbarring Mr. O'Neill for his demonstrated and persistent indifference to the truth would not "foster a tendency toward inconsistent dispositions for comparable conduct" or "otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). Any other course of action in response to Mr. O'Neill's unscrupulous conduct would inject inconsistency into our jurisprudence and demean bar membership in the eyes of the public.

## IV. Conclusion

For the foregoing reasons, Mr. O'Neill is hereby disbarred from the practice of law in the District of Columbia. For purposes of reinstatement, the effective date of respondent's disbarment will not begin to run until Mr. O'Neill files an affidavit

that complies with D.C. Bar Rule XI, § 14(g). Moreover, Mr. O'Neill may not be reinstated until he pays Mr. Fusco full restitution[13] plus interest, as well as the costs of litigating this action in Ireland.

*So ordered.*

---

[13] As detailed above, Mr. O'Neill has previously made representations that he had repaid Mr. Fusco or that repayment was imminent. *See supra* note 4. As of the issuance of this opinion, we have no confirmation that Mr. O'Neill has paid Mr. Fusco the money owed to him.